## BETHLEHEM STEEL COMPANY *v.* ELIZABETH TRAYLOR.

[No. 40, October Term, 1929.]

*Decided January 8th, 1930.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*George Weems Williams* and *Boyd B. Graham,* with whom were *Howard C. Price* and *Marbury, Gosnell & Williams* on the brief, for the appellant.

*Leonard Weinberg* and *Harry J. Green,* with whom were *George Z. Ashman* and *Weinberg & Sweeten* on the brief, for the appellee.

URNER, J., delivered the opinion of the Court.

The rulings under review in this case were made during and after the trial of issues in the Baltimore City Court on appeal from an order of the State Industrial Accident Commission disallowing the appellee's claim of compensation on account of the death of her husband, Wesley Harrison Traylor, which occurred while he was an employee of the appellant corporation. The issues involved the question whether Traylor's death resulted from an accidental personal injury arising out of and in the course of his employment by the appellant, or whether his death was the result of natural causes unconnected with his employment. On each of the submitted issues the jury returned an answer favorable to the claimant's contention. The employer subsequently filed a motion to dismiss the appeal to the lower court on the theory that it was without jurisdiction to entertain the appeal under the provisions of the Workmen's Compensation Law. The motion was overruled, and a judgment reversing the order of the commission was thereupon rendered. From that judgment the employer appealed.

There are thirty-three exceptions in the record. Twenty-

four relate to rulings on the admissibility of evidence at the trial of the issues, two to the granting or refusal of instructions to the jury, and the remaining exceptions were reserved in the course of the hearing on the motion to dismiss.

The testimony at the trial was mainly directed to the question whether the pneumonia which was the immediate cause of Traylor's death resulted from asphyxiation by carbon monoxide gas, by which he was alleged to have been overcome five days previously while repairing a gas fuel engine at the employer's plant. In opposition to his widow's claim it was contended that the illness from which he died was not accidental but was produced by natural causes. That defense was supported by evidence tending to prove that there was no gas in the engine pit where Traylor was working, that other employees engaged there were not similarly affected, and that he attributed to indigestion the attack of vertigo, pain, and nausea which culminated in his fatal illness. It was in support of the claim as against such a contesting theory that most of the testimony excepted to by the employer was offered, and its admissibility must be determined with proper regard to the particular nature of the controversy.

It was testified by Mrs. Traylor that her husband, on several occasions prior to his final seizure, came home from his work at the appellant's plant feeling sick and complaining that he had been gassed; that when he returned the last time he crawled up the steps, was pale and black around the eyes and in great misery, and said he was suffering from the effects of gas; and that after remaining at home several days under the doctor's care he was taken to the hospital, where he died five hours later.

Mrs. Carey, from whom Traylor rented the rooms which he occupied with his wife and child, testified that several times he looked sick on returning from his work, and said he had pains in his chest caused by gas; that the last time he came home she saw him as "he crawled up the steps on his hands and knees", and when she asked what was the matter he said: "The damn thing got me now, Mrs. Carey"; that

he looked as though he were dying, "was black under the eyes, of an ash color"; and that while he was at home in bed he "rolled from side to side and vomited bright red blood up sometimes in clots."

Otis Snead, who worked "in the same crew" with Traylor, testified that he had himself suffered headaches from gas in the engine room where they were employed, and that he had seen Traylor "knocked out several times by it"; that his appearance was "like as if any one was asleep and had deep circles under the eyes"; and that he was put on a stretcher and taken in an ambulance to the dispensary. On another occasion, the witness said: "I think we were working on an exhaust valve. Traylor was working on an oil pump connected with the same engine. He was down in the pit and started up the steps, but fell and was taken out and carried to the dispensary. He just seemed to be limber and looked the same as he always did when he was full of gas. I know how men look when they get full of gas because I have seen several of them down at the plant." At another time, Snead said: "We were working on the valve. We thought it was shut—he (Traylor) was trying to open it and he went down and one of the fellows hollered to him, told him he had better come out, that there was too much gas for him and he could not stand it, and he started up and fell. * * * He was knocked cold and was taken to the dispensary on a stretcher. * * * Air was injected into him by means of a rubber hose through the nose." In reference to the time when Traylor is said to have been made fatally ill by the gas, Snead testified: "Traylor was working on the exhaust valve, which is halfway down the pit. * * * I could smell that there was plenty of gas there that night. It kind of filled you up, choked you, got you weak and gave me a headache. I saw Traylor come out of the pit. * * * He stayed out for a few minutes and then went back. From his actions it looked as though he had cramps and was in misery. * * * Some ten minutes later he came out the pit again and together with S. P. Summerville who had him by the arm, headed towards the office. * * * Traylor looked pretty bad. I did not see him again until the next

morning about seven o'clock, when I saw him sitting on a steam turbine in the electrical building. He was dark under the eyes and had an ashy appearance." This was just before Traylor was taken to his home.

The generation and elements of the gas used in the engines on which Traylor customarily worked while in the appellant's service were described by Mr. Randall, the company's chief chemist. The gas, he said, is conveyed to the engines from the blast furnaces, where it is produced in the process of smelting the ore, and contains about 28 to 30 per cent. of carbon monoxide which is "highly dangerous in large quantities." He stated: "I have seen one or two people asphyiated by carbon monoxide. Their appearance is pale, their lips colorless or bluish, and their eyes glassy. They are dark under the eyes. * * *" Mr. Randall said he had not been in the engine pits but had walked through the building where they were located and had not smelled any gas or suffered any ill effects from its presence.

John H. Schutz, formerly employed as a machinist by the appellant, testified that Traylor and Snead were "knocked out by gas" several weeks before Traylor became finally disabled. "I was not in the pit that night," he said, "but I know there was plenty of gas there because the grates were raised and I could smell it coming out of the pit." That was an unusual condition, he testified.

The testimony of Dr. Knell, who attended Traylor in his last illness, was, in part, as follows: "I knew Traylor a year before he died and had treated his family. He was a robust man of powerful build. On May 28th, 1927, at about ten o'clock in the morning, I was called to see Traylor. I found him sitting on the edge of the bed gasping for breath. He was suffering a good deal of pain in his chest. * * * His face was in a cold perspiration and occasionally when he gasped he would cough up red blood. He said he had been gassed at Sparrows Point. * * * I have had experience with carbon monoxide poisoning. * * * I would say he did not have pneumonia that morning. My diagnosis at that particular time, there was a poisoning from something. It was necessary to

get him to the hospital, as I recall, on either the second or third day. By that time I had changed my opinion and I told his wife and also the hospital people that I thought bronchial pneumonia was setting in." This development was expected, he said, "because an irritant will produce pneumonia." On cross-examination Dr. Knell stated: "My impressions taken from what the man told me and what I know of acute poisoning, this man was suffering an acute gas poisoning. * * * The man absolutely was gassed. * * * Gas poisoning is liable to have an effect on almost any of the main organs."

Dr. Gichner, testifying as an expert, said: "In many instances, in very severe gas poisoning, if the patient survives, pneumonia follows: Where a person is suffering from pneumonia, it is not common or usual for him to look ashen and white and to spit bright red blood. Pneumonia as a rule does not begin that way. Those symptoms would be descriptive of a collapse, of severe hemorrhage, or gas, or something of that nature, which is poisonous, * * *." In answer to a question based upon the hypothesis of the truth of other testimony, Dr. Gichner said: "I would consider the cause of death a secondary pneumonia induced by some deterioration of the whole system by gas, * * * pneumonia following gas poisoning." Replying to questions on cross-examination, he testified: "A man who has once been gassed is much more liable to get it again than a person who has never been gassed. * * * It depends upon the amount of gas and the intervals. With Traylor it appeared that he had been gassed rather recently, some three weeks ago."

The first three exceptions were against the admission of the testimony of Mrs. Traylor and Mrs. Carey as to Traylor's statements, when he was sick on his return from work, on occasion prior to the last, that he had been gassed at the plant. In *Standard Oil Co. v. Mealey,* 147 Md. 252, it is said, in the opinion delivered by Chief Judge Bond: "Divergent views have been entertained in other jurisdictions on the relaxation by a court of its ordinary rule for excluding hear-

say evidence on review of compensation cases. * * * In New York, where the statutory provision for the relaxation of rules of evidence before the commission is the same as that in the Maryland act, hearsay testimony is received in court reviews, but an award is not permitted to be based on such testimony alone. *Carroll v. Knickerbocker Ice Co.*, 218 N. Y. 435; *Belcher v. Carthage Machine Co.*, 224 N. Y. 326; *State Treasurer v. West Side Trucking Co.*, 233 N. Y. 203; *Hansen v. Construction Co.*, 224 N. Y. 331. And to the same effect are *Kelley's Case*, 123 Me. 261; *Royal v. Hawkeye Portland Cement Co.*, 195 Iowa, 534; *Reck v. Whittlesberger*, 181 Mich. 463; *Garfield Co. v. Accident Commission*, 53 Utah, 133; *Rockefeller v. Same*, 58 Utah, 124; *Valentine v. Weaver*, 191 Ky. 37; *Riley v. Carnegie Steel Co.*, 276 Pa. 82." After stating reasons why the ordinary rules of evidence should not be too strictly applied or unduly relaxed in such cases, the opinion proceeds:

"With these considerations in mind, then, we have to decide whether it was proper for the court below to admit statements of a deceased workman said to have been made to his wife, and to his physicians, that he had fallen and struck his side at a spot where the malignant growth later developed, and to refer to the jury the determination of the question of fact whether death resulted from an accidental injury, when this is all the evidence there is of such an occurrence. Without extending the discussion at this time in an attempt to work out final general principles, we have concluded that in this particular case the action of the court in each respect was proper. The statements are reproduced by three or four witnesses who heard them at first hand from the workman. They refer to a simple fact, and were such as to leave no room for substantial misunderstanding, and it seems to us basing a finding of fact on them is, after all, hardly any greater relaxation of wise caution than has long been made in the admission of secondary evidence to establish the contents of a writing which cannot be produced. We hold, therefore, that there was no reversible error either in

the admission of the evidence or in the refusal of the prayer directing a verdict for the defendant because of insufficient evidence to support the finding of fact; and the judgment is therefore affirmed."

In that case the hearsay testimony was the only evidence of the accidental injury for which compensation was claimed, while in the present case there is proof by eye-witnesses of the facts to which the hearsay testimony relates. In support of the claimant's theory as to the nature of her husband's injuries, it was pertinent to prove that he suffered and finally died from the culminating effects of a series of asphyxiations (*Victory Sparkler Co. v. Francks,* 147 Md. 368), and the contemporaneous declarations of Traylor in regard to his earlier injuries from gas at his place of employment were merely cumulative as considered in relation to the direct evidence tending to sustain that theory. It may be conceded that the considerations which influenced the ruling in *Standard Oil Co. v. Mealey, supra,* do not apply with equal force to the circumstances of this case, but the practical and controlling inquiry is whether the admission of the statements excepted to presents an adequate ground for a reversal of the judgment and a remand of the case for retrial. In our opinion, the ends of justice, as administered in a case arising under the remedial terms of the Workmen's Compensation Act, would not be properly served by such a conclusion.

Six of the exceptions were taken because of the admission of testimony of other workmen, which we have quoted, as to the presence, and injurious effects of gas, where Traylor was working, at times antedating the attack from which he did not recover. This testimony was relevant to the question in dispute as to whether gas was ever emitted from the engines in sufficient quantity to affect a workman injuriously, and was also material as tending to prove that successive asphyxiations rendered Traylor's system more sensitive to the one from which he is said to have lost his life. In *Victory Sparkler Co. v. Francks, supra,* it is said in the opinion by Judge Parke: "Nor can the fundamentally accidental nature of the

·injury be altered by the consideration that the infection was gradual throughout an indefinite period, as this simply implies a slow development of the malady, or that, instead of a single accidental injury, there was a succession or series of accidental injuries culminating in the same consequential results."

Another exception denied the propriety of the hypothetical question propounded to Dr. Gichner as the basis of the expert opinion which he expressed. The question is criticized as containing an incomplete and incorrect summary of certain testimony taken in the absence of the expert and asked to be considered by him in connection with the evidence which he had heard. This objection, in our opinion, was properly overruled. · The facts which the witness was asked to assume, as testified in his hearing, or summarized in the question, presented a sufficiently full and fair hypothesis for the expression of his opinion that the cause of Traylor's death was a secondary pneumonia resulting from the deterioration of his system by gas.

Many of the evidence exceptions were not pressed in this court. All of them have been considered, but in none of them do we find any ground for a reversal.

The employer's prayers to have the case withdrawn from the jury were rightly refused. The evidence adduced by the claimant, and heretofore quoted in this opinion, while met by proof tending to an opposite conclusion, was legally sufficient to require the submission of the case to the jury on the stated issues of fact. No point is made of the rejection of other prayers of the employer except as to the prayer which asked for a directed verdict favorable to its theory if the jury should find that Traylor's death was caused by a disease not resulting from an accidental injury arising out of and in the course of his employment, even though the jury should find that the effect of gas on his physical condition "was such that the result of such disease would not have been fatal but for such condition". As already indicated, the dispute in the case was as to whether pneumonia, which was the

immediate cause of Traylor's death, originated from gas poisoning received in the course of his work. The evidence offered by the claimant tended to prove that the pneumonia had such an origin, while the testimony of the employer's witnesses was directed to the exclusion of the alleged asphyxiation as a cause of the fatal disease. There was no support in the proof for the theory that, while the death-producing illness was not caused by the injurious effects of gas inhaled at the employer's plant, yet the result of the pneumonia might not have been fatal except for such an injury by gas to the system of the employee. In other respects the purpose of the prayer was served by instructions granted at the employer's request, but the clause specially referred to was objectionable as raising an unsupported issue. It is unnecessary to determine whether the theory thus sought to be submitted would otherwise be legally sustainable.

Two instructions were granted at the claimant's request. They authorized answers favorable to her contention on the issues, if the jury should find that her husband was accidentally poisoned by the inhalation of noxious gas while engaged in the performance of the work for which he was employed, and that such injury arose out of and in the course of his employment, and that his death "was due to pneumonia and/or dilation of the heart, which was induced or accelerated as the proximate result of the poisoning," even though it might be found by the jury that he was then and theretofore suffering "with a tubercular lesion and/or chronic bronchitis". Those instructions were in substantial accord with the rulings of this court in *Armour Fertilizer Works v. Thomas,* 153 Md. 631; *Standard Gas Equipment Corp. v. Baldwin,* 152 Md. 321; and *Dickson Construction Co. v. Beasley,* 146 Md. 568.

There was no error in the action of the trial court on any of the prayers.

The motion to dismiss the appeal from the State Industrial Accident Commission to the Baltimore City Court avers that at the time of the hearing and award by the commission, and

continuously thereafter, the claimant was and still is a resident of the State of Virginia, and that the alleged injury to her husband occurred in Baltimore County, and therefore the court had no jurisdiction as to the appeal under the terms of section 56 of article 101 of the Code, relating to appeals in Workmen's Compensation cases. The cited section provides: "Any employer, employee, beneficiary or person feeling aggrieved by any decision of the commission, affecting his interests under this article, may have the same reviewed by a proceeding in the nature of an appeal and initiated in the circuit court of the county or in the common law courts of Baltimore City having jurisdiction over the place where the accident occurred or over the person appealing from such decision. * * *"

At the hearing on the motion there was proof that Mrs. Traylor, some time after her husband's death, went to the home of her parents at Dendron, Surry County, Virginia, and appeared to be living there about the period of the appeal. When testifying before the commission and answering the question as to where she lived, the claimant said: "Dendron, Virginia." The death of her husband occurred on June 1st, 1927. The hearing before the commission occurred on October 18th and 21st, 1927, and the appeal from the order of the commission disallowing the claim was taken in the following December. During the year and a half of his employment by the appellant, Traylor and his wife made their home in rented rooms on North Paca Street in Baltimore. Mrs. Traylor testified, at the hearing on the motion, in part as follows: "After my husband's death I was ill and unable to accompany his body to Virginia. I followed the day after and went to my in-laws at Stony Creek, where the body was buried. I remained there a few days and then returned to 115 N. Paca Street, Baltimore. * * * When I came to Baltimore to live with my husband I made my home at 115 N. Paca Street and never lived any other place. Upon returning to Baltimore after the burial of my husband I occupied one of the rooms that I formerly had there. Around the 2nd of July I returned to Stony Creek and remained with

my husband's family until the latter part of August. I was nervous and ill and my sister-in-law, who lives in Richmond, Virginia, came and took me there for a while. I remained there about two weeks, then came back to Baltimore and stayed until October 8th, 1927. I then stopped off a day or two at Richmond. About the 12th of October I returned to Baltimore and stayed until the latter part of that month. Q. Where did you stay on that occasion? A. 115 N. Paca Street. Q. In the same or a different room? A. In a different room. I do not recall just when I left, but I returned to my husband's family at Stony Creek until the early part of December. I then spent a couple weeks with my parents in Dendron, Virginia, and then I returned to my husband's family at Stony Creek for about three months. About the latter part of February, 1928, I returned to Baltimore and remained a couple of weeks and then returned to Stony Creek until I went to work in Hopewell, Virginia. * * * "I returned to Baltimore in June, 1928, having given up my employment. I stayed in Baltimore a couple of weeks and then got a call to come back to Hopewell to work, which I did. I stayed there working until the middle of July, when my nerves broke down and my father came and taken me home. I do not recall just how long I stayed at Dendron, but I think it was the early part of October, 1928, and then I went to Washington. * * * The latter part of October of that year I left and went to Perkasie, Pennsylvania, to see my sister-in-law. I stayed up there and worked for a while and left the latter part of November. I then came back to Baltimore and stayed two or three weeks and then went to Washington in November, 1928, and then returned to Dendron to my parents to ask for help and stayed home for Christmas with the exception of one trip I made to Baltimore. Q. Did you leave anything at 115 N. Paca Street after you left in 1927? A. Part of my clothes were there and my trunk. I was going from place to place and could not take my winter clothes and summer clothes with me. Q. Why did you leave them there? A. Because I called that my home and would always go there when I came back to Baltimore. I then returned to

Hopewell and worked for four weeks in the silk mill and was taken ill and went to spend the Christmas holidays with my parents. * * * I remained there until I came to Baltimore. Q. And about when was that? A. It has been about a month and a half ago. I came direct to Baltimore from my parents in Dendron and have been living at 115 N. Paca Street ever since. I am not yet employed in Baltimore. Q. Why have you not yet gone to work in Baltimore? A. Because I have a small child and I could not leave her alone. Q. Do you or not intend to remain in Baltimore? A. I do. Q. Why? A. Because I am expecting to get work."

Mrs. Carey, the owner of the rooms which were occupied by Mrs. Traylor and her husband, testified: "The Traylor family first came to live with me on January 18th, 1926. Q. And how long did they remain there, do you know? A. Clear up until he died, and then she stayed with me there. On the 10th of June Mrs. Traylor went down to her people. Mrs. Traylor has never removed her trunk and effects from my house. She has always her home, when she comes to Baltimore, with me. There is nothing besides some clothing left here. They never had any furniture here because the rooms were furnished * * * Q. Since the time in June, 1927, has Mrs. Traylor ever lived at 115 N. Paca Street, and if so approximately when was it and for how long a period? A. She would always spend a couple months—sometimes spend a month or so with her mother, and then come back and stay a couple of months. Whenever she came here she would be with me and then she would take another trip. On the occasions when she came to Baltimore she stayed with me as long as she wanted to, sometimes a month, sometimes more. She would be here on other occasions than when her case was being tried."

As the injury which was found by the jury to have caused Traylor's death was not received in Baltimore City, the authority of the Baltimore City Court to entertain the appeal depended upon the question as to whether it had "jurisdiction over the person appealing." Under the circumstances described by the claimant and her witness, Mrs. Carey, in

testifying against the motion to dismiss, with which the testimony offered by the employer is not materially conflicting, our conclusion is that the Baltimore City Court, in the trial of the case, possessed and exercised a competent jurisdiction. The argument for the motion assumed that the test of jurisdiction in such a case is the amenability of the appealing party to service of process and the rendition of a personal judgment. Analogy is sought to be drawn from the principle of decisions applying the Code provisions relating to attachments against non-resident debtors. There is no occasion to decide in this case whether those laws would apply to a person in the claimant's situation when her appeal was entered. It is with reference to the terms and objects of the Workmen's Compensation Law, and to a person voluntarily invoking the court's jurisdiction, that the present question is determined. In our judgment it would not be consistent with the purpose or policy of that statute to dismiss the appeal in this case in view of the circumstances shown by the record.

Preliminary to the hearing on the motion to dismiss the appeal in the court below, the employer requested a ruling as to the burden of proof on the motion, and the court held that it rested on the employer. An exception to that ruling was noted. The argument for the exception relies upon the general rule that one who claims any right or benefit under proceedings of a court acting in the exercise of a special or limited authority must affirmatively show the facts upon which its jurisdiction depends. 15 C. J. 832. If it be assumed, though we do not hold, that such a rule would apply when an effort is made after trial on the merits to have the court declare that it was without jurisdiction in the case because of the nonresidence of the party by whom the proceeding was instituted, the ruling as to the burden of proof on the motion resulted in no practical prejudice to the present appellant, since the preponderance of the evidence supported the jurisdiction in dispute.

There is no reversible error shown by any of the evidence exceptions taken at the hearing on the motion.

*Judgment affirmed, with costs.*