## MOUNT SAVAGE MINING COMPANY ET AL. *v.* EDITH BAKER.

[No. 51, April Term, 1930.]

*Decided June 12th, 1930.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*William C. Walsh* and *Willis R. Jones, Assistant Attorney General,* for the appellants.

*Howard Galbreth,* with whom was *J. Philip Roman* on the brief, for the appellee.

Urner, J., delivered the opinion of the Court.

At the trial of this case in the Circuit Court for Allegany County, on appeal by the widow of the deceased employee, from adverse action by the State Industrial Accident Commission on her claim under the Workmen's Compensation Law, the following issue was submitted to the jury: "Was the death of George J. Baker on October 11, 1928, the result of an accidental injury arising out of and in the course of his employment by the Mount Savage Mining Company?" The answer of the jury was in the affirmative, and the court accordingly entered judgment reversing the decision of the commission to the contrary. The principal question which the appeal from that judgment presents for review is whether there is legally admissible and sufficient evidence in the case supporting the theory, upon which the claim for compensation is based, that the death of the claimant's husband was caused by monoxide gas produced by a blasting operation in the coal mine where he was engaged in the duties of his employment. After setting off a charge of dynamite in the mining "room" to which he had been assigned, Baker returned for the purpose of removing the rock dislodged by the blast, and was later found dead in a kneeling position, with a shovel in his hand, and apparently having been in the act of using it in the customary course of his work. He was

forty years old, and was in good health, as his wife testified,. when he went from his home to the mine for the last time. An autopsy disclosed a dilatation of his heart, and this was described by all of the expert witnesses as the immediate cause of his death. But the experts were not in accord on the question as to whether the heart dilatation was caused by monoxide gas poisoning. All agreed that a fatal inhalation of monoxide gas would result in such a condition of the heart, and it was proved, without denial, that monoxide gas in possibly dangerous volume is produced by explosions of dynamite like the one with which this case is concerned, but the two physicians who performed the autopsy testified that the enlargement of the heart may have been due to chronic myo-carditis, of which they found indications.

The objection urged against the expert testimony that the fatal dilitation was caused by monoxide gas does not appear to involve a dispute as to the general qualification of Dr. Claybrook, the claimant's expert witness, to express an opinion on such a subject, but controverts the sufficiency of the grounds upon which his opinion is based. It is argued that his conclusion is merely conjectural and is unsupported by adequate knowledge of the particular facts which it assumes. The following extracts from Dr. Claybrook's testimony are pertinent to that contention. In reference to the gases generated by blasts in operation in the mine he testified: "Well you have burned up in the chamber all the oxygen, practically, in it until it has had a chance to be replaced. With only one end open it would not be replaced as quickly as it would if you had a cross ventilation and the peculiar effect of this explosion is that carbon monoxide is given off very largely in the explosion of dynamite and black powder in mines. It is also given off from charcoal braziers and it is given off around lime kilns. It is also given off in large quantities in coke ovens and in England they always have two men to work at a time around a coke oven; in case one man drops down the other man can drag him away to safety, because it is insidious in its effects.

It has no smell and is colorless, and because four-tenths of one per cent. is dangerous because it has such an affinity for the blood. It has about three hundred times the affinity for—or ability to be absorbed by the blood that oxygen has, and it prevents the oxygen from entering into the blood— therefore the man dies really from lack of oxygen. Q. What effect would a gas such as you have just described—carbon monoxide gas—have on the heart? A. Well, the gas in quantities sufficient to produce death has the same effect that other conditions do where the patient dies from oxygen starvation, which he does in this case. The heart muscle doesn't get a sufficient supply of oxygen. The lungs don't get it and the heart whips itself up until it gets dilated and in this type of trouble the heart is always found in a con- dition of dilatation at death upon *post mortem* examination. (Court): Is the gas released from dynamite? A. Dynamite and black powder, especially; the books give that as the chief danger from dynamite and black powder. Q. Then if an autopsy showed that the heart was dilated would that show in any way what had caused the death? A. It would not show what caused the death, but you would expect to find a dilated heart in gas poisoning."

At a later stage of the case, after the evidence as to the autopsy had been adduced, the examination of Dr. Claybrook was resumed, and proceeded, in part, as follows: "Q. From all the testimony including the autopsy, are you able to state what in your opinion caused the death of George F. Baker? (Court): Better ask him some other questions. He has heard about the dilatation of the heart. Better ask him if he can state what caused that. Q. Doctor Claybrook, can you give an opinion as to what caused the dilatation of the heart? A. I think so; yes. (Court): You have heard the testimony as to the disease of myocarditis? A. Yes; I think I have heard it all. (Court): Could that have produced the dilated heart? A. You are asking my opinion. I don't think that that has been shown conclusively, and if there was, it is a matter of opinion among doctors. I say that because of the finding of

hypertrophy. Myocarditis doesn't cause hypertrophy. Myocarditis means a swollen and inflamed heart. The testimony here is that the heart was hypertrophic—not inflamed. That is the testimony. That is what the findings were in the autopsy. (Court) : I will let him ask the general question. Did you say you could tell from all the testimony? A. Yes, I think so. I could give an opinion. Q. Assuming all of the testimony to be true are you able to state what is your opinion? A. Yes; I think I am. Q. Now what is your opinion? (Court) : I will admit his opinion subject to exception. Its admissibility will depend somewhat upon his reasons. Q. What in your opinion caused the death of George J. Baker? A. I think he died of monoxide poisoning. Q. Now will you tell the court and jury on what you base your opinion that he died of monoxide poisoning? A. Well, in the first place, here is a shot put off, practically in a bottle. It has a narrow mouth—a wide room with a blind end. When you set off an explosion in a cavity of that kind the air that isn't consumed in the blast is blown out of the chamber—necessarily would be, and the chamber is filled up by other gases coming from the explosion. As I said yesterday, an explosion is produced by the sudden and rapid production of gases and there wasn't free access for the smoke and gases to get out. It is a matter of testimony that the man went in sooner than usual and later he was found huddled over his shovel, stooped down apparently ready to shovel coal. Now the nature of monoxide gas, as I said yesterday, it is insidious. It has no odor, no taste and no smell, and you don't feel any symptoms coming on, just as a man sits in his automobile with the exhaust open. If the gas catches him you find him sitting at the wheel—dead—because he had no time to get out. This man was slumped down right in his position to work. If a man gets sick from heart disease he gets short winded. As a rule they get short winded and they quit and sit down or lie down. The books all say that in acute failure of the heart it isn't instantaneous or sudden, but that you would find him in that condition—in working position, with gas poisoning because that is how it comes on them. It

creeps on them without any warning and they drop right in their tracks. That explains to my mind why he would be found dead in that position and why it would be monoxide gas instead of the heart. Now as to the *post mortem*. The *post mortem* stated he has dilatation of the heart. That is one of the by-products of monoxide poisoning. They don't die of the dilated heart in monoxide poisoning. They die from the absence of oxygen in the blood. The carbon monoxide in the blood operates as I explained, so that the blood cannot take up oxygen. The blood—or rather carbon monoxide has a very much greater affinity for the blood than oxygen, and the effort of the heart to get oxygen when it can't get it results in overstrain and dilatation of the right side in an effort to get oxygen in the lungs."

The physicians who performed the autopsy having testified that there was some blood remaining in the heart after the body had been embalmed, and that the blood did not have the cherry red color characteristic of the effects of monoxide gas poisoning, Dr. Claybrook further said in his testimony: "Now as to the changes in the blood. You have here a man that has already been embalmed. Ordinarily undertakers—I don't know what the procedure is up there—but ordinarily they open the axillary artery and remove all of the blood that can be removed. Then they put on a connection and let the embalming fluid into the vessels—pump it in and let that flow through every little vein and capillary. There is always a little bit of blood will leak back into the heart, but it is a very small quantity that remains. I don't know what the chemical was that was used in this case, but most of the chemicals have a tendency to make the blood black, and I don't think you could possibly expect the blood to show red after being embalmed, after monoxide poisoning, because they use so many other chemicals, and the only way you could possibly tell there was monoxide gas in the blood would be by examination by a spectroscope."

In our judgment, the trial court would not have been justified in excluding the testimony which we have quoted. It

demonstrates a competent knowledge of the subject upon which the opinion of the witness was expressed, and it had a legal tendency to prove the fact to which it was directed. The opposing evidence, and the circumstances to which. it refers, could not be held to have nullified the effect of the expert testimony upon which the claimant relied. That testimony had sufficient probative value to entitle her to have it considered by the jury, and the objections to its admissibility were properly overruled.

It was conceded at the trial, as stipulated in the record, that "if Baker's death was caused by monoxide gas inhaled by him while he was working in the mine of the defendant coal company on or about October 11, 1928, his death was the result of an accidental personal injury arising out of and in the course of his employment * * * ." This concession was consistent with our recent decision in *Bethlehem Steel Co. v. Traylor,* 158 Md. 116.

Having concluded that the admitted evidence legally tended to prove that Baker's death resulted from the inhalation of monoxide gas at his place of work, while he was performing the duties of his employment, it necessarily follows that we approve of the lower court's refusal to instruct the jury, as proposed by the defendant, to return a negative answer on the issue as to whether he died as the result of an accidental injury.

There were several other exceptions reserved in the course of the trial, but they present no question of sufficient importance to require more than the statement of our conclusion that they do not show any erroneous ruling.

*Judgment affirmed, with costs.*