## HORN ICE CREAM COMPANY ET AL. *v.* FANNIE BELLE YOST.

[No. 65, October Term, 1932.]

*Decided January 12th, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Daniel S. Sullivan,* with whom was *James J. Carmody* on the brief, for the appellants.

*Charles E. Moylan* and *J. Warren Burgess,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This appeal is from a judgment of the Court of Common Pleas of Baltimore City, affirming an award of the State Industrial Accident Commission of Maryland in favor of Fannie Belle Yost, claimant, against Horn Ice Cream Company, employer, and Union Indemnity Company, insurer, allowing the claimant compensation for the death of her son, George W. Yost, on the theory that it was caused by an accidental personal injury arising out of and in the course of his employment by Horn Ice Cream Company.

Yost, at the time of the accident, was employed as a helper on the employer's ice cream delivery truck. On June 13th, 1929, the truck was at Halethorpe, Maryland, and Yost, in the course of his employment, alighted from it as it was turning, and while he was near it an ice cream tub or freezer

fell from the top of the truck and struck him. The important question presented by the appeal is whether there was in the case admissible evidence legally sufficient to show that his death was due to injuries caused by that accident.

On August 9th, 1929, the employer filed with the commission its "First Report of Injury," in which it stated: "Employee alighted from truck, as truck was turning, tub fell off top of truck, striking employee left shoulder and leg"; that the injury occurred in the course of the employment; that it provided medical attention on the day of the accident; and that it had been notified of the accident by the injured employee.

Fannie Belle Yost, after giving testimony sufficient to establish the fact, which is not disputed, that she was partially dependent upon her son, the injured employee, for support, testified that on the night of the day of the accident her son was brought home from the hospital, and "I seen him when he came home * * * he was crippled and he said the tub had hit him and came down on the side of his head, down on his shoulder, down his hip and on down to his leg and knocked him down * * * he said 'I was knocked out' "; that the next morning he was "suffering with his neck"; but that he insisted on going to work; that on the night after the accident he told her that the "leaders of his neck were hurting him and his shoulder"; that he said he had a pain in his head "like a headache"; that he complained of headaches every day after that and "everything in his neck and shoulder"; that from the date of the injury until she took him to the hospital she noticed that he was "giddy, flighty like in his head" and when he "would go out of the door he would pull on his coat and run out fast"; that before the accident he never complained of headaches, he was never afflicted with giddiness, he was a "hardy strong boy" in good health; that throughout she bathed and rubbed him with hot water, chloroform liniment, that she besought him not to go to work, but that he said that his "boss needed him" and that he continued to work until the day before he died. "That when he was brought home that day and the doctor gave him his medicine,

she saw that he was flighty in the head. That he didn't talk as usual, seemed to be out of his mind. That he was conscious, but like something bothered him in his head, and he told her the doctor said to give him the medicine every two hours and he went to bed, and she put an ice bag on top of his head as the doctor ordered, and she gave him water and he responded to his medicine every two hours all night and she thought he was improving, and the next morning, about ten o'clock, she thinks half past nine, she had given him his medicine and just about ten o'clock or few minutes after he whirled over in the bed and he looked at her and he went over in convulsions, that she went out of the room and got some help, and No. 6 Engine House man saw her and they got the municipal ambulance and took him to the hospital." On cross-examination she added that, while her son went to work every day, he "complained all month," and that when he came home after the accident she saw bruises on his leg and shoulder, but none on his head, but that he had said that his head was sore.

W. C. Stallman, driver of the truck at the time Yost was injured, knew that Yost had alighted from the truck as it was stopping, and that he was struck by an empty five-gallon ice cream freezer or tub, which fell from the top of the truck which was "right high." He saw Yost being helped up from the ground and advised him to go home, but Yost insisted on finishing out the day, and the next day Yost said he was "feeling pretty good."

Joseph Narer testified that he was from fifty to seventy-five feet from the truck at the time of the accident and saw it happen, and that, "as the truck swayed the corner, from the corner end it was not—you could say four or five feet from the road, it came near to a stop when the tub made a swing and came down just as they say, and he saw the man and he thought it had struck him on the head, and he, witness, says, if that struck him in the head it would kill him and they went over there, and a man came up the opposite way to catch the car and he picked him up and then he, George Yost, complained about being hurt down by his hip,

it glanced him and he, witness, made sure the side of the tub must have glanced his head, he, witness, was standing right there"; that it took two men to put the tub upon the truck, that when they picked George Yost up he was dizzy and trembling, and "that he saw the tub glance down, he could not tell where it hit him, Mr. Yost, he, witness, thought it hit him in the head; it looked like it struck him in the head and he, Mr. Yost fell. That he could not see what part of the body was hit. * * * That he, witness, could not tell whether it hit him square in the head or a glanced blow when it came down. That he did not see any blood or scratches."

Clarence Hoffman testified that he had an unobstructed view of the accident from a distance of about fifty feet, and "that he, Mr. Yost, stepped off and a freezer rolled off the side and came down and hit him, Mr. Yost, and knocked him on the sidewalk. That a tub fell down right off the truck and hit the man and knocked the man to the sidewalk. That it looked as if the tub hit him on the top of the head. His two eyes saw the tub fall off the truck and fall on the man and it looked like it hit him on the head, as far as he, witness, could see by his sight"; that after the accident Yost was "crying" and it looked to witness as though he were about to faint, and on cross-examination, he said that he saw the tub strike Yost, but that he did not see it strike his head, he, witness, said it struck the side of his body. That he supposes the bottom part of the tub struck his, Mr. Yost's head.

Clarence Grace, who said that he also had an unobstructed view of the accident, testified that it appeared to him that the tub struck Yost on the shoulder and threw him to the cement pavement; that after the accident Yost appeared dizzy, was crying, and limping.

Upon that testimony, which he had either heard or read, Dr. Leon Freedom, a qualified physican, stated, without objection, that in his opinion Yost had not died from encephalitis lethargia, as certified in the "Proof of Death" by the attending physician, but from a brain disease induced by a head injury.

For the appellants, Dr. David Tenner, resident physician

at Mercy Hospital, who attended Yost when he was brought to that hospital shortly before his death, described the examination and symptoms of the patient, upon which, together with the history of the case obtained from the mother, the diagnosis of encephalitis lethargia was based. He further testified that in his opinion the cause of Yost's death was encephalitis lethargia. Dr. A. C. Gillis testified that he too had diagnosed Yost's disease as encephalitis lethargia, and that there was no causal connection between "an injury" and that disease.

Dr. Leon Freedom was recalled, and, after stating that he had heard the testimony of Dr. Tenner and Dr. Gillis, testified that his opinion had not been affected by their description of the symptoms and condition of the patient at the hospital.

The original transcript from the Industrial Accident Commission was filed in the Court of Common Pleas on February 17th, 1931, and on May 29th, 1931, on the motion of the appellants, the case was remanded to the commission for further testimony. On that remand appellants called Henry W. Otto, an engineer of the Horn Ice Cream Company, who testified that he saw the accident, and that the tub fell and Yost fell, but he did not see the tub, which weighed about fifty pounds and was water soaked, hit Yost, that he asked Yost whether he was hurt, and he said that his leg was hurt.

Bernard E. Ridgely, called for the claimant, said that he too saw the accident, and that he saw the tub strike Yost on the head.

Upon the record the appellants contend (1) that the testimony of the claimant as to statements made to her by her son on the day of the accident concerning his injuries was improperly admitted; (2) that the testimony taken on the remand to the commission should not, under chapter 406 of the Acts of 1931, have been considered; (3) that their first and second prayers directing a verdict for the appellants should have been granted; and (4) that the court erred in modifying their third jury prayer.

Mrs. Yost had stated that her son had told her that the tub had come "down on the side of his head," and the refusal of the court to strike out that statement is the subject of the first exception. The testimony of three witnesses, Hoffman, Narer, and Ridgely, permitted an inference that the tub had struck Yost on the head, so that, unless their testimony is to be rejected, as without probative force, it is not apparent how the ruling could have injured appellants.

Appellants do, it is true, assert that Narer said that "he could not tell where" the tub hit Yost, and that Hoffman said that he did not see the tub "strike George Yost's head," but that assertion is not supported by the record. Narer did say "he could not tell where it hit him," but he said more than that; he said, he saw the tub fall, "it glanced him," "he made sure the side of the tub must have glanced his head," "he thought it hit him in the head, it looked like it struck him in the head." And while Hoffman did in fact say that he did not see the tub strike Yost's head, he too said more than that. He testified that it "looked as if the tub hit him on the top of the head." "His two eyes saw the tub fall off the truck and fall on the man and it looked like it hit him on the head as far as he, witness, could see by his sight," that he "supposed the bottom part of the tub struck his, Yost's head." Those witnesses saw the accident from a distance of from fifty to seventy-five feet, they saw the tub fall, and they saw it strike Yost, they could not of course at that distance see the actual contact between the tub and Yost's head, but to say that their testimony was not sufficeint to permit the inference that the tub struck Yost on the head would be mere quibbling. And the testimony of Ridgely, taken before the commission on the remand, who was from fifteen to twenty feet from the truck, is positive and unequivocal that the tub hit Yost on the side of the head and knocked him down.

By the express mandate of the statute, Code, art. 101, sec. 10, the commission in its investigation of claims is not bound by the "usual common law or statutory rules of evi-

dence," but may make the investigation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties, and to carry out justly the spirit of the article. In view of the informal nature of the proceeding under the act, and of the fact that the commissioners are not required to be trained in the law, the freedom of action thus allowed is not only wise, but, in the interest of speedy and substantial justice, unavoidable, but the difficulty has been to define its limits. That there must be limits to the discretion which the commissioners may exercise in admitting or rejecting evidence appears inevitable, otherwise the whole administration of the article would lack the certainty which is so essential an element of our jurisprudence, and the problem has been to formulate working rules which will not violate the spirit of informality and liberality which is inherent in the article, but which will prevent the introduction of evidence which under any system of law should have little or no probative force. As pointed out by Chief Judge Bond in *Standard Oil Co. v. Mealey*, 147 Md. 252, 127 A. 850, 852, in dealing with that problem, courts have reached widely varying conclusions, especially in respect to the admission of evidence which at common law would be classed as hearsay. From an examination of the digests, the text-books and the decisions of courts of last resort, it cannot be said that the problem, if indeed in its nature it is susceptible of final or complete solution, has been satisfactorily solved. The most that has been done is to mark the outer limits of the discretion reposed in the commission, leaving its application within those limits to be determined by the facts of each case to which it is applied. It would be difficult to define those limits with any greater precision or clarity than was done in the case last cited, where it is stated that: "We conclude that the courts are not intended to withdraw from litigants under the act all the precautions which, in the course of time, have been worked out as essentials of orderly, certain justice. And whatever foundation there may be for objections to the rule excluding hearsay in its full extent, it must be admitted that

there is still a large residuum of necessary precaution embodied in it. It is to be remembered that, so far as the courts might adjudicate upon second-hand reports of a witness' direct observation, they must usually act upon statements reproduced in part only, not tested by questioning, or by an oath, and reproduced through a very fallible medium. It is by this same rule that statements reproduced at third or fourth hand are barred out. And, too, while this is one effect of relaxation of the rules to accommodate court reviews to the nature and working of the commission, it must be borne in mind that there are other effects. The rule requiring the production of a writing itself, rather than a verbal statement of its contents, for instance, is affected just as much as is the rule excluding hearsay." Applying those principles to the facts of that case, it was held that hearsay statements admitted in that case were not injurious, because the statements made to the wife and physicians of a deceased employee were reproduced by other witnesses who heard them at first hand from the employee, they referred to a simple fact, and left no room for substantial misunderstanding. In *Bethlehem Steel Company v. Traylor,* 158 Md. 116, 148 A. 246, it was held that the admission of statements by a deceased employee to his wife as to the cause of his injury was not reversible error, because other eyewitnesses testified to the same fact. In *Waddell George's Creek Coal Company v. Chisholm,* 163 Md. 49, 161 A. 276, it was held that hearsay was admissible because there was little more in it than was given in the testimony of eye witnesses produced before the commission. Applying the test which controlled in those cases, that the hearsay evidence left no substantial room for misunderstanding, we find no reversible error in the ruling involved in the first exception.

There is neither substance nor merit in the appellants' second point, that the evidence taken on the remand before the commission should not have been considered. The remand was made on the appellants' own motion, no objection was made by them to the introduction of the evidence in the

trial court, and it may be assumed that they themselves actually read a part of it (the testimony of Henry W. Otto) to the jury in the trial of this case in that court. Under those circumstances it is too late now for them to say that it was not properly before the court and the jury.

The third point, that on the evidence the court should have directed a verdict for the appellants, requires little discussion. The prayers raising that point necessarily conceded that Yost, who was at the time twenty-one years old, was struck on the head by a water-soaked ice cream tub weighing fifty pounds falling from the top of a high truck, that it knocked him down on a cement pavement, that he was so severely injured that he was dizzy and crying, and, while he continued to work, was taken to a hospital the same day, that prior to the accident he was strong, hardy and in good health, that after the accident he complained constantly of headaches, and of pain in his neck and shoulder, was giddy, "flighty like," and that when he was taken to the hospital about a month later he had a marked cyanosis, had convulsions, and on the following day he died. They also concede that in the opinion of Dr. Freedom, an experienced and qualified physician, his death was caused by a head injury. That conclusion was contrary to the opinions of Dr. Gillis and Dr. Tenner, who said that Yost died of encephalitis lethargia. That is to say, all the physicians testified that he suffered from an encephalitis or inflammation of the brain, but Dr. Freedom ascribed that condition to a head injury, while Drs. Gillis and Tenner ascribed it to epidemic encephalitis or encephalitis lethargia, otherwise called "sleeping sickness." There is no possible ground upon which this court can reject the testimony of Dr. Freedom, which was in without objection, and accept that of the other physicians. They all appeared before the commission, and their testimony was read to the jury, and it was within the exclusive province of that body to pass upon their credibility and the weight of their evidence. But upon the facts summarized, upon no possible theory was the court authorized to withdraw the case from the consid-

eration of the jury, and we find no error in its ruling refusing the appellants' first and second prayers.

The fourth point is that the court erred in modifying appellants' third prayer. As offered, the prayer read as follows: "The court instructs the jury that the presumption of correctness in favor of the award and decision of the State Industrial Accident Commission is a rebuttable one, that is to say, subject to evidence tending to prove that said award is incorrect, and if the jury shall believe from the evidence that. George W. Yost died from 'sleeping sickness' and that the accident mentioned in the testimony neither caused the said 'sleeping sickness' nor contributed in the causation thereof, then the verdict shall be for the employer and insurer, appellants, and the answer to the first issue shall be 'No' and the answer to the second issue shall be 'Yes.'" The court modified it by striking out the words, "subject to evidence tending to prove that said award is incorrect," and granted misleading. Under the terms of chapter 406 of the Acts of it as modified. The words stricken out were, to say the least, 1931, as construed in *Thomas v. Pennsylvania R. Co.*, 162 Md. 509, 160 A. 793, the jury were limited in their consideration of the case to evidence actually taken before the commission. To have told them that the award of the commission was "subject to evidence tending to prove that said award is incorrect," might have meant either that the jury were at liberty to reach a different conclusion from that announced by the commission upon the same evidence, or it may have meant that the award was subject to other and additional evidence taken before the court. And while, as a matter of law, no such additional evidence could have been offered, the jury as laymen might have been ignorant of that fact. Again, the award was not only subject to a construction of the same evidence by the jury different from that placed on it by the commission, but it was also subject to the operation of legal principles to be stated by the court and applied by the jury, which may have led to a different conclusion than that reached by the commission. The words stricken out added nothing to the legal principles stated in what remained in the prayer,

but rather obscured its meaning, and, in view of what remained, that omission deprived the appellants of no benefit which the prayer as originally offered would have given them. There was, therefore, no error in the rulings involved in the refusal of appellants' third prayer as offered, and its allowance as modified by the court.

Since we have discovered no error in the rulings involved in the appeal, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*