DEAN HUGH OLIVER *v.* STATE OF MARYLAND

[No. 294, September Term, 1982.]

*Decided January 10, 1983.*

The cause was argued before LOWE, WILNER and WEANT, JJ.

*Clarence W. Sharp, Assigned Public Defender,* for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William R. Hymes, State's Attorney for Howard County,* and *A.*

*Gallatin Warfield, III, Assistant State's Attorney for Howard County,* on the brief, for appellee.

WEANT, J., delivered the opinion of the Court.

On 23 June 1981, after a fourteen day trial, a jury in the Circuit Court for Howard County found Dean Hugh Oliver, appellant, guilty of: murder in the first degree and felony murder, robbery with a deadly weapon, robbery, attempted rape in the first degree, first degree sexual offense, breaking and entering at night with the intent to commit a felony and intent to steal, theft of less than $300, and assault and battery, all arising out of the 21 November 1980 killing of Paulette Lintner. Although the State sought the death penalty, the jury imposed life imprisonment for the murder. The trial judge ignored the first degree murder conviction and sentenced appellant on the felony murder into which he merged most of the other offenses. Additionally, appellant was sentenced on the theft of property valued at less than $300 to a term of 18 months to run consecutive to the life sentence. He also received a ten year sentence for the battery conviction to run consecutive to the life term, but concurrent to the 18 month sentence.

The facts developed in this case, represented by a transcript in excess of 4,000 pages, are such that we deem it best to discuss them as we entertain the eight contentions appellant raises on appeal:

> 1. Whether the trial court erred in denying the motion to suppress the in-court identification of Appellant by Officer Mark Colbert and in permitting the in-court identification as well as the evidence of Colbert's out-of-court photographic identification.

> 2. Whether the trial court erred in not admitting evidence of the refusal of Emerson Baxter, whose testimony was obtained under terms of a plea agreement, to take a polygraph examination, which action was one of the conditions of the plea agreement.

3. Whether Appellant was denied his constitutional right of confrontation, the effective assistance of counsel, and a fair trial by the actions of Emerson Baxter in refusing to testify when called by Appellant after testifying as a State's witness.

4. Whether the testimony of Emerson Baxter was barred by the prohibition of approver testimony in Art. 27, § 635, Md. Ann. Code.

5. Whether Appellant was properly charged under the second, amended indictment.

6. Whether the trial court erred in the reinstruction on aider and abettor in response to the question posed by the jury.

7. Whether the evidence was sufficient to support the convictions.

8. Whether the trial court erred in sentencing Appellant separately for theft (under $300) and battery.

1.

Appellant asserts that all identifications by Officer Colbert, extrajudicial as well as in-court, should have been suppressed. The hearing judge originally denied the suppression motion; after additional facts were discovered relating to Colbert's identification, a second hearing was held to reconsider that motion. Ultimately, the second hearing judge denied the requested suppression.

It must be noted at the outset that appellant is not advancing the garden variety objection that the identification procedure promoted "a very substantial likelihood of irreparable *misidentification.*" *Simmons v. United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968) (emphasis added); in fact, appellant concedes that the composition of the photographic array and the manner of presentation to Colbert were unimpeachable. Rather, the challenge is to several post-arrest confrontations between Colbert and appellant or pictures of appellant. Appellant alleges that these were illegal confrontations which usurped

Colbert's recollection of the original encounter and were ultimately the basis for Colbert's in-court identification of appellant.

The post-arrest events which are alleged to have been the actual basis for Colbert's in-court identification were: (1) Colbert's private retention of appellant's arrest photograph and newspaper photo, (2) his brief review of the original photo-array before testifying at the first suppression hearing, and (3) his exposure to appellant prior to and during the second suppression hearing.

The general rule is that once taint is shown as a result of an illegal confrontation, the burden shifts to the State to show by clear and convincing evidence that the identification had a source independent of the confrontation. *Mills v. State,* 19 Md. App. 614, 617, 313 A.2d 560, 563 (1974). The hearing judge made the following determination in deciding to permit the in-court identification:

> The Court is convinced that the subsequent viewing of photographs would not affect in any material manner Officer Colbert's ability to make an in-court identification. It is abundantly obvious from Officer Colbert's testimony that he is a credible witness and worthy of belief when he states that any identification that he might make of the defendant would be based upon his personal face to face contact.

While this Court's decision in *Mills v. State, supra,* suggests that Colbert's unequivocal testimony was an adequate basis for clearly and convincingly establishing an independent source, a consideration of the facts will highlight the reliability of Colbert's assertion that his identification of appellant was based on personal contact.

At the first suppression hearing Colbert testified that his review of the photo-array had "nothing to do with this identification whatsoever." At the second suppression hearing Colbert testified at length on the basis of his identification:

A. [Officer Colbert] Well, my memory of the subject is, like I say, based mostly of what I viewed him that night, the observation of him looking over at him, and he restricted looking at me, avoided eye to eye contact when he — when I asked him questions, when he answered questions. But I still have a good enough vision in my memory as far as what he looked like standing outside, as I looked up at him, and looking over at him, to make a combination of both, to make an identification of him.

Q. [Defendant's attorney] And wouldn't the single photograph and the newspaper article influence your mind in any way, shape or form with reference to the in-court identification?

A. It would not influence my mind as far as making an identification. I'm basing it as I was the twenty-second and the photo array on the twenty-fourth.

Appellant had little reason to complain about Colbert having viewed him at the second suppression hearing since Colbert appeared in court in adherence to a summons issued by appellant. Thus, it was incumbent upon appellant to take steps to isolate Colbert from a view of appellant if he felt that confrontation might be potentially prejudicial.

The salient facts surrounding Colbert's initial identification are noteworthy. Colbert picked up a Negro male in close proximity to the scene of the crime shortly after the crime had occurred. Unfortunately, the crime was not discovered until the next morning. Colbert had this individual whom he picked up on Frederick Road in the passenger seat of his police cruiser for about one-half of an hour. Colbert was suspicious enough of the individual that he ran a check on him using the name, date of birth, and address supplied by the individual. The date of birth and address matched appellant's date of birth and address. The name provided, Kevin Hall, did not appear on any police file.

Colbert provided a detailed description of the individual he had chauffeured about on the night in question:

> He was about twenty-two years of age, a black male.
> He was about five eight, and was of a slight build,
> a hundred and forty, a hundred and fifty pounds. I
> recalled a short Afro bush, a thin mustache, very
> thin, clean shaven, except for a mustache. I don't
> recall shoes. And he had a medium complexion.

Nothing was introduced at trial to show that this description did not fit appellant.

Colbert was exposed to a photo-array the evening of November 22nd and asked to identify the individual he had picked up on Frederick Road. The officer asserted that the individual was not portrayed in the array. A second photo-array was shown to Colbert the following morning. He picked appellant out of this array and stated that he was 85% certain that this was the individual he had escorted in the early morning hours of November 22nd. This identification was made less than 48 hours after the initial confrontation.

We agree with the hearing judge that these events provided Officer Colbert, a police officer of seven years, with ample opportunity (*i.e.,* about half an hour) to make a reliable identification of a man about whom he was highly suspicious. Thus, the suppression motion was properly denied.

### 2.

Appellant contends that his defense was hamstrung when he could not question the State's prime witness, Emerson Baxter, about his refusal to submit to a polygraph examination. Baxter was subject to the same charges as Oliver.

In his framing of this issue, appellant has misstated the facts. The record contains no plea agreement executed by Baxter, or evidence thereof, where submission to a polygraph was a term of the agreement. There was testimony that this term had been discussed but the witness stated that it was never incorporated into any plea agreement accepted by Baxter.

Notwithstanding this factual discrepancy, appellant would fail on this argument even had Baxter executed such an agreement to submit to a polygraph examination. Judge Lowe, in speaking for this Court in *Johnson v. State,* 31 Md. App. 303, 355 A.2d 504 (1975), disposes of appellant's contention:

> The reason for excluding the *results* of a polygraph examination is the questionable reliability of such evidence. Similarly, the admission into evidence of whether an accused agreed or refused to take such a test may give rise to jury speculation as to his reasons for submitting or refusing to submit to the test. In both cases, a determination of guilt or innocence may be affected by an accused's state of mind after the crime, rather than upon evidence produced related to the crime itself. [31 Md. App. at 307, 355 A.2d at 508, emphasis in original.]

In *Johnson,* this Court carved a very limited exception to the clear rule prohibiting testimony about polygraphs and allowed evidence of the *use* of a polygraph when the voluntariness of a confession is questioned. Clearly, the *Johnson* exception is inapplicable to the instant case. *See also Mitchell v. State,* 51 Md. App. 346, 443 A.2d 651 (1982).

In appellant's proffer to the trial judge it was posited that Baxter had refused to submit to the polygraph because "it would demonstrate his deception." To allow appellant to question Baxter about his refusal to take the polygraph would only lend legitimacy to a test which is considered unreliable. Surely, if the direct results of a polygraph examination are inadmissible, any attempt to indirectly convey or initimate the results of a polygraph examination *never administered* must fall flat on its face.

3.

In order to comply with the terms of his plea agreement, Baxter was cooperative when called as a State' witness. However, when called to testify by the defense, Baxter speciously raised the 5th Amendment's privilege against

self-incrimination as a response to each question posed. Appellant raises a three-pronged attack requiring that all of Baxter's testimony be stricken: the denial of (1) his constitutional right of confrontation, (2) effective assistance of counsel, and (3) a fair trial. Since appellant has only provided argument for the first prong, we shall not address the second two points. *VanMeter v. State,* 30 Md. App. 406, 407, 352 A.2d 850, 851, *cert. denied,* 278 Md. 757 (1976).

Appellant cites 5 Wigmore, *Evidence* § 1391 (Chadbourn rev. 1974) as authority for the proposition that "[w]here the witness, after examination in chief on the stand, has *refused* to submit to cross-examination, the opportunity of thus probing and testing his statements has substantially failed, and his direct testimony should be struck." [Emphasis in original.] This remedy was requested and denied below; on appeal, we do the same.

At the outset it should be noted that Baxter was called to testify at appellant's trial on two separate occasions. He was first called by the State. Appellant then cross-examined Baxter at length, probing his testimony in the following areas: (1) his commitment to a mental institution for evaluation because he had heard voices, had hallucinations, and had twice attempted suicide; (2) details concerning the crime itself; (3) various injuries on Baxter's face and hands at the time of arrest; and (4) Baxter's plea agreement with the State.

Appellant desired to question Baxter on certain psychiatric reports. However, a foundation for those reports first had to be laid by a Dr. Freinek whom appellant planned to call as a defense witness. It was for the limited purpose of probing Baxter on these reports that the trial judge granted a continuance of cross-examination. However, it was made clear by Baxter's attorney and the trial judge that Baxter could only be questioned in this regard if he elected to waive his privilege.[1] When recalled by appellant, Baxter refused to waive this privilege.

---

1. Md. Code, Courts and Judicial Proceedings Art., § 9-109 grants a witness a privilege to refuse to disclose communications relating to diagnosis or treatment of a patient's mental or emotional disorder. The statute provides for certain situations where this privilege does not exist, none of which is applicable here.

Once Baxter refused to waive this privilege, appellant had no constitutional right to cross-examine Baxter on these reports. Indeed, appellant does not contend that this privilege denied him the right of confrontation. *Avery v. State,* 15 Md. App. 520, 292 A.2d 728, *cert. denied,* 266 Md. 733 (1972).

After Baxter made it clear that he would not consent to Dr. Freinek testifying, appellant attempted to question Baxter on two other areas: (1) the crime itself, and (2) certain statements he had made to Dr. Herbert concerning injuries to his face and hands at the time of arrest. It is of paramount importance, however, to realize that at this point Baxter was no longer being cross-examined but rather was wearing the hat of a direct witness for the defense. It was in the role of a direct witness, not cross-examination witness, that Baxter raised the 5th Amendment privilege against self-incrimination. Appellant has cited to us no authority where a direct witness who refuses to testify has been held to be a denial of the right of *confrontation.* All of the cases cited are inapposite inasmuch as they involve a witness who freely testifies on direct but refuses to answer questions on cross-examination.

More importantly, appellant had already cross-examined Baxter on these two areas while Baxter was on the stand as a State's witness. Baxter provided answers to all questions posed. The inconsistencies in Baxter's telling of how he had sustained the injuries was revealed to the jury. Baxter claimed that he received those injuries when running through the woods the night of the crime. Officer Greisz testified that Baxter had told Dr. Herbert at the time of his arrest that he had received those injuries while playing basketball. Thus two contradictory versions were presented to the jury. It was for the jury to decide what weight to accord the different narratives.

The record plainly reveals an extensive cross-examination of Baxter by appellant. The two specific areas upon which appellant attempted to question Baxter as a direct witness — the crime itself and the injuries to his face and hands —

had previously been covered at considerable length on cross-examination. While the jury did not hear Baxter admit that he told different versions of how he had sustained the injuries directly from Baxter's mouth, the jury did hear the conflicting version from Officer Greisz. Evidently, the jury did not find Baxter to be a credible witness because his story fingered appellant as the actual murderer and the jury specifically found that appellant was *not* a principal in the first degree.

We hold that appellant was not denied his constitutionally protected right to confront witnesses who appeared *against* him and think the trial judge correctly refused to strike Baxter's testimony.

4.

Appellant raises an 1809 statute dealing with approvers as a bar to the admission of Emerson Baxter's testimony. Md. Ann. Code, Art. 27 § 635 states in pertinent part: "and approver shall never be admitted in any case whatsoever." As persuasive authority, appellant cites Black's Law Dictionary (5th ed. 1979) definition of approver:

> The old English Law, an accomplice in crime who accused others of the same offense, and was admitted as a witness at the discretion of the court to give evidence against his companions in guilt. He was vulgarly called "Kings Evidence." One who confessed himself guilty of felony and accused others of the same crime to save himself from punishment. If he failed to convict those he accused he was at once hung.

Appellant suggests that if we substitute what is sometimes called today a "State's Witness or Evidence" for "Kings Evidence" in the above definition, Baxter comes completely within this definition and is therefore an "approver." Neither appellant nor the State refers us to any case whatsoever where the definition of approver was applied.

The problem with old statutes which have apparently never been interpreted [2] is that modern usage often changes the meaning ascribed to words within the statute which at that time had very precise usage. Such is the case with the definition of approver.

To be an approver, one must "accuse" another of the same crime. In common parlance to accuse means to blame; clearly Baxter *blamed* appellant for the murder and rape of the victim, Paulette Lintner. However, "accuse" had a very specific meaning as used in the definition of approver.

In *A History of the Criminal Law of England,* Volume I (1883), Chapter 8, (Page 244) Sir James Fitzjames Stephen discussed the use of *accusation* at common law.

> Since the Norman Conquest . . . there have been also three modes of *accusation,* namely, *appeal or accusation by a private person,* indictment or accusation by a grand jury, and informations which are accusations either by the Attorney-General or by the Master of the Crown Office. [Emphasis added.]

At common law, private prosecution of crimes was long permitted. Thus, an approver is one who brings *formal charges against and privately prosecutes* his accomplices. That is the reason for Black's Law Dictionary's interpretation that the *approver convict* those he accused or be hanged. Appellant was "accused" in this case by an indictment presented by the Grand Jury of Howard County. Hence the testimony received from Baxter, an accomplice, was not that of an approver as known to common law which would have been precluded by Art. 27, § 635.

In the landmark decision of *Rex v. Rudd,* 1 Comp. 331 (1775), Lord Mansfield provides an instructive discourse on the practice of approvement:

> There are *three* ways in law and practice, which give accomplices a right to a pardon; and there is

2. Our research did not yield any Maryland case analyzing this statute.

*one* mode, which entitles them to a *recommendation* to the king's mercy.

The three legal ways are *first,* in the case of *approvement,* which still remains a part of the common law, though, by long discontinuance, the practice of admitting persons to be approvers is now grown into disuse. *Secondly,* the case or persons whom come within the statutes 10 and 11 of *Will. 3. c. 23. sect.* 5 and 5 *Ann. c.* 31 *Sect.* 4. And *thirdly,* the case of persons to whom the king has, by special proclamation in the Gazette or otherwise, promised his pardon.

Approvers have a right to a pardon, persons within the statutes of *William* and *Anne,* have a right to a pardon, and the other class of offenders who come in under the royal faith and promise have a right to a pardon; and in all these cases the court will bail them, in order to give them an opportunity of applying for a pardon.

There is besides a *practice,* which indeed does not give a legal right; and that is, where accomplices having made a full and fair confession of the whole truth, are in consequence thereof admitted evidence for the crown, and that evidence is afterwards made use of to convict the other offenders. If in that case they act fairly and openly, and discover the whole truth, though they are not entitled of *right* to a pardon, yet the *usage,* the lenity, and the practice of the court is, to stop the prosecution against them, and they have an equitable title to a recommendation for the king's mercy.

We think it beyond question that at common law Baxter was not an approver who had a *right* to a pardon but at best would have come within the equitable practice of giving him *hope* for recommendation to the mercy of the crown.

In Mansfield's discussion of the equitable practice at common law, adopted in analogy to the law of approverment yet still quite different, he states "that evidence [of the

accomplice] is afterwards made use of to convict the other offenders [appellant]." Baxter's testimony was used to convict, not formally charge (accuse) appellant. Hence Baxter was not a common law approver and Art. 27, § 635 is inapplicable.

### 5.

On 14 December 1980 appellant was charged in a 19-count indictment. His attorney entered his appearance on 19 December 1980 and appellant entered a plea of not guilty and requested a trial by jury. On 3 March 1981 another indictment was filed. Appellant's attorney reentered his appearance on 19 March 1981. Appellant entered a plea of not guilty and elected a jury trial on this indictment. At hearings on 11 May 1981 the State indicated its intention to proceed upon the indictment filed later in time.

The heart of this issue is the nature of the second indictment. Appellant contends that the second indictment is actually an *amended* indictment. He bolsters this claim with two pieces of evidence: (1) the forelady of the Grand Jury designated it in her own handwriting an "Amendment to Indictment 9878 Returned by this Grand Jury on December 16, 1980," and (2) both indictments are numbered 9878. Then appellant correctly argues that substantive changes to an indictment can only be made with the consent of the defendant. Md. Rule 713 b.

The trial judge characterized the second indictment as a *separate* indictment. He discounted the gratuitous comment by the Grand Jury Forelady as "superfluous." We agree.

The second indictment contained all of the original 19 counts and added 4 others: first degree rape, attempted first degree rape, second degree rape, and attempted second degree rape. We think it significant that these four additional counts did not find their position as counts 20 through 23 in the second indictment. Rather, the Grand Jury included the four new counts as Counts 5 through 8. Indictments which are amended by the addition of new counts are usually tacked onto the end of the previous indictment. More importantly, we note that appellant's

attorney reentered his appearance in response to the second indictment and that appellant entered a plea of not guilty and elected a jury trial on the second indictment. All of this suggests that appellant treated the second indictment as a new and separate indictment. Nowhere does appellant complain that the second indictment denied him the right to be informed of the accusation against him in time to prepare his defense. *Thanos v. State,* 282 Md. 709, 387 A.2d 286 (1978). Thus we are inclined to accept, but need not conclude, that appellant's actions were tantamount to a consent to amendment of the original indictment.

Appellant has no ground for complaint merely because he was indicted twice for the same event. A subsequent indictment is not rendered invalid merely by the existence of a prior indictment for the *same or related offense. Barnes and Burgess v. State,* 1 Md. App. 123 at 127, 227 A.2d 763, 766 (1967). If there is some irregularity in an indictment it may be corrected in a later indictment upon which the defendant may then be retried. *Greathouse v. State,* 5 Md. App. 675, 685, 249 A.2d 207, 214, *cert. denied,* 253 Md. 734 (1969), n.4.

Here, the State corrected the original indictment by having four additional counts added to the second indictment. The State made an election to proceed on the second indictment. No claim of harrassment, unfair surprise, or inability to prepare a defense has been advanced by appellant and we can perceive none. Once jeopardy attached at the trial under the second indictment, the first indictment was effectively terminated. Nor could appellant, once jeopardy attached in the trial under the second indictment, be reindicted for the same offenses.

6.

After the case had been submitted to the jury, the following question was posed to the court by that body:

> If the jury were to be satisfied that a premeditated murder was committed by either Baxter or Oliver,

or both acting together, but is not morally certain which, may Mr. Oliver be convicted of premeditated murder?

The judge answered the question in the affirmative, reinstructed the jury concerning the equal guilt of an aider and abettor in the identical language of its earlier instruction — unobjected to by appellant and, from our review, without error — and repeated its previous instruction concerning the State's burden to prove appellant's guilt beyond a reasonable doubt.

Under Maryland law reinstructions to the jury in response to jury questions are totally within the discretion of the trial judge. *Funkhouser v. State,* 51 Md. App. 16, 31, 440 A.2d 1114, 1123, *cert. denied,* 293 Md. 331 (1982). This discretion may be abused, and will be rectified by an appellate court, if the trial judge's response is ambiguous, misleading, or confusing to the jurors. *Battle v. State,* 287 Md. 675, 685, 414 A.2d 1266, 1271 (1980). But, the appropriate response to a jury question is dependent on many factors. As noted in *Kelly v. State,* 270 Md. 139, 143, 310 A.2d 538, 541 (1973):

> Clearly the person in the best position to weigh these "facts and circumstances" is the trial judge. From his vantage point he has the opportunity to surmise which of the phrases in his instructions have been absorbed and which should be embellished or repeated.

We are not alerted to, nor do we perceive, an incorrect statement of Maryland law in the trial judge's response. We think the trial judge's response was even-handed as he provided a meaningful answer to their question and simultaneously admonished them of the State's heavy burden in a criminal case.

7.

In this issue, appellant asks us to test the sufficiency of the evidence which resulted in his conviction. The rule in

Maryland is clear: a defendant may not be convicted on the uncorroborated testimony of an accomplice. *Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977). However, only slight corroboration is required which would tend either: (1) to identify the defendant with the perpetrators of the crime, or; (2) to show the defendant's participation in the crime. *Foxwell v. State,* 13 Md. App. 37, 39, 281 A.2d 123, 124 (1971). We think Officer Colbert's identification of appellant in close proximity to the crime is adequate corroboration. (See Argument 1.)

8.

The jury found appellant guilty on nine counts. The judge merged most of the other offenses into the felony murder. However, he refused to merge two of the convictions: battery and theft of property valued at less than $300.

Appellant argues, and the State concedes, that the battery conviction should have been merged under the required evidence test. To be separate offenses under the test, ". . . each offense must require proof of a fact which the other does not . . . .. However, if only one offense requires proof of a fact while the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited." *Newton v. State,* 280 Md. 260, 268, 373 A.2d 262, 266 (1977). Battery requires proof of a touching or unlawful injury. *Price v. State,* 5 Md. App. 127, 130, 245 A.2d 600, 602 (1968). Felony murder requires that the touching or unlawful injury proximately cause a death. Hence, the required evidence test mandates a merger of the battery conviction into the felony murder conviction. *Beard v. State,* 42 Md. App. 276, 399 A.2d 1383, *cert. denied,* 285 Md. 727 (1979). Accordingly, the 10-year sentence for the battery conviction must be vacated.

Also, the trial judge should have merged the misdemeanor theft conviction (property less than $300) with the robbery conviction (property greater than $300). The judge had

correctly merged the robbery conviction into the felony murder. Therefore, the 18-month sentence for the misdemeanor theft conviction must be vacated.

*Judgments affirmed.*
*Sentences relating to the battery conviction and misdemeanor theft convictions vacated.*
*Costs to be paid by appellant.*