822 A.2d 537

**PRINCE GEORGE'S COUNTY, Maryland,**

v.

**Eric HARTLEY, et al.**

No. 2660, Sept. Term, 2001.

Court of Special Appeals of Maryland.

May 2, 2003.

582

Eugene H. Pickett, II, Associate County Attorney (Leonard L. Lucchi, County Attorney on the brief), Palmer Park, for appellant.

Kevin Hardy (Kevin T. Baine and Williams & Connolly, LLP on the brief for appellees Castaneda and Johnson), Washington DC, Alice Neff Lucan of Washington DC, for appellee Hartley.

Argued before MURPHY, C.J., HOLLANDER, and CHARLES E. MOYLAN, JR. (Ret'd, specially assigned), JJ.

MURPHY, Chief Judge.

In the Circuit Court for Prince George's County, Ruben Castenada, Eric Hartley, and Gregory C. Johnson (collectively "appellees") filed motions to quash administrative subpoenas directing them to attend and give testimony at a police department disciplinary hearing. Appellees argued that, as newspaper reporters, they have a qualified privilege under the First Amendment and cannot be compelled to testify. The circuit court quashed the summonses and this appeal followed, in which Prince George's County, appellant, presents three questions for our review:

1. Did the Circuit Court err in granting the Appellees['] Motion to Vacate Order and Quash Summons by finding that the Prince George's Police Department failed to

show a compelling and overriding interest in the news reporters' testimony?

2. Did the Circuit Court err in its application of the Maryland Shield Law and The First Amendment?

3. Does the media have an absolute privilege from testifying?

For the reasons that follow, we hold that neither the First Amendment nor the Maryland Shield Law entitles appellees to refuse to testify at the administrative hearing. We shall therefore reverse the judgments of the circuit court.

## BACKGROUND

On August 13, 2001, appellees were at the federal courthouse in Greenbelt, Maryland, covering a trial that involved allegations of misconduct by two Prince George's County Police Officers. Newspaper articles written by appellees reported that, during the lunch break, in the courtroom vestibule, Officer Brian Lott stated, "I wish I would have been there in '95. I would have shot the bastards, and we wouldn't have all this crap." The statement attributed to Officer Lott appeared in an article written by Mr. Castenada for *The Washington Post*, an article written by Mr. Johnson for *The Gazette Newspapers*, and in an article written by Mr. Hartley for *The Prince George's Journal.*

In response to the publications, the County initiated an investigation, and ultimately filed an administrative charge (of "unbecoming conduct") against Officer Lott. When contacted by the County's investigator, appellees refused to give statements and stated that they would not testify at the administrative hearing. Thereafter, appellant issued summonses directing that the appellees appear and give testimony at the disciplinary hearing.

Appellant obtained a court order requiring appellees to appear before the hearing board in accordance with the summonses. Subsequently, appellees filed motions to vacate the court's order and quash the summonses. At the hearing on

appellees' motions, the circuit court heard argument from counsel to the parties and from counsel to Officer Lott. Appellees argued that their published articles should be relied upon as their statements. Additionally, appellee Hartley offered an affidavit as a substitute for his testimony. Appellant's counsel represented to the court that (1) an attorney, who was also present at the federal courthouse, heard only a portion of Officer Lott's statement; (2) the County's investigator had questioned everyone present at the courthouse when the statement was purportedly made; and (3) nobody else either heard the statement or is willing to admit to such.

Although Officer Lott did not file a motion to intervene or any other pleading with the circuit court, his counsel argued that if the reporters were compelled to testify, he would want to (1) examine any notes that appellees had made, and (2) conduct a very extensive cross-examination of the appellees, consisting of 150–200 questions. According to Officer Lott's counsel, if appellees testified and the court limited his right to question them, Officer Lott would be deprived of his right to constitutionally adequate cross-examination.

Ruling from the bench, the circuit court found that, although the appellees were in possession of information that is relevant to the issue of whether Officer Lott engaged in unbecoming conduct, (1) the County would be able to present evidence of Officer Lott's statement by means of an alternative, non-media source; (2) a trier of fact could find the newspaper articles to be persuasive evidence that Officer Lott made the statement in question; (3) Mr. Hartley's offer to provide an affidavit was a reasonable alternative to appellees' testimony; and (4) appellees could assert a qualified privilege that would prevent Officer Lott's counsel from conducting a "full" cross examination. Based upon those findings, the circuit court quashed the summonses, explaining:

> The fact of the matter is that the Court cannot imagine fashioning a protective measure that would be respectful of the right of Officer Lott to confrontate [sic], to confront live witnesses.

Quite frankly, what I have right here is that [the] arguments [by Officer Lott's counsel] on behalf of Mr. Lott tips the scale.

The Court does believe that Officer Lott would have a right to a full cross examination of the witnesses as to bias. And bias can be reached in a number of fashions. But even beyond the bias questions there would be a right of cross examination.

The Court believes it would be unreasonable to restrict cross examination to preclude questioning of the reporters as to what investigation was conducted in relationship to hearings, what was reported to have been heard. And the Court finds that Prince George's County has not established a compelling and overriding interest in the disclosure that would be sought by allowance of the subpoenas.

And the Motion of Rubin [Ruben] Castenada and Gregory P. Johnson to Vacate and Quash Summonses and the Motion to Vacate the Motion for Order to Testify and Quash Summonses for Testimony of Eric Hartley are granted.

## STANDARD OF REVIEW

An order granting a motion to alter or amend judgment is ordinarily reviewed under the abuse of discretion standard.[1] *Falcinelli v. Cardascia,* 339 Md. 414, 430, 663 A.2d 1256 (1995); *Gallegos v. Allstate Ins. Co.,* 144 Md.App. 213, 235, 797 A.2d 795 (2002), *cert. granted,* 370 Md. 268, 805 A.2d 265 (2002); *Wormwood v. Batching Sys.,* 124 Md.App. 695, 699, 723 A.2d 568, *cert. denied,* 354 Md. 113, 729 A.2d 405

---

1. Md. Rule 2–534 provides:

   In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial.

(1999); *see also WBAL–TV Div., Hearst Corp. v. State,* 300
Md. 233 at 247, 477 A.2d 776 (1984) (reviewing a court's order
denying a motion to quash a summons under the abuse of
discretion standard).[2] In this case, however, we are persuad-
ed that the circuit court erred as a matter of law in arriving at
the premature conclusion that the motions should be quashed
on the ground that appellees would be entitled to avoid their
obligation to answer questions that Officer Lott's counsel had
the right to ask.

## I. The First Amendment

■ Appellant argues that (1) appellees are eyewitnesses to
a relevant event; (2) the appellees' testimony is not obtainable
from alternative means; and (3) appellant has a compelling
and overriding interest in presenting evidence of what oc-
curred on the occasion at issue. According to appellant, even
if appellees have a qualified privilege, it would not be applica-
ble in this instance because neither the United States Su-
preme Court nor a Maryland appellate court has ever ruled
that members of the press have an absolute privilege to refuse
to testify. Appellees argue that, under the First Amendment
and Article 40 of the Maryland Declaration of Rights,[3] they

---

**2.** The abuse of discretion standard has been defined as " 'a reasonable
decision based on the weighing of various alternatives.' There is an
abuse of discretion 'where no reasonable person would take the view
adopted by the [trial] court.' " *Fontaine v. State,* 134 Md.App. 275, 288,
759 A.2d 1136 (2000)(quoting *Metheny v. State,* 359 Md. 576, 604, 755
A.2d 1088 (2000)) (quoting *In re Adoption/Guardianship* No. 3598, 347
Md. 295 (1997)). "Thus, where a trial court's ruling is reasonable, even
if we believe it might have gone the other way, we will not disturb it on
appeal." *Fontaine,* 134 Md.App. at 288, 759 A.2d 1136.

**3.** The First Amendment provides that "Congress shall make no law . . .
abridging the freedom of speech, or of the press. . . ." Article 40 of the
Maryland Declaration of Rights states: "That the liberty of the press
ought to be inviolably preserved; that every citizen of the State ought to
be allowed to speak, write and publish his sentiments on all subjects,
being responsible for the abuse of that privilege." We have made "no
distinction between the free speech and press guarantees in Article 40
of the Maryland Declaration of Rights and the First Amendment. . . ."
*Lightman v. State,* 15 Md.App. 713, 727, 294 A.2d 149 (1972).

have a qualified privilege that entitles them to refuse to testify in this case.

In *Branzburg v. Hayes*, 408 U.S. 665, 682, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), a majority of the United States Supreme Court rejected the argument that news reporters have a testimonial privilege:

> **We are asked to create another [privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.** Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

*Id.* at 690, 92 S.Ct. 2646 (emphasis added) (footnote omitted).

Although it did not establish a privilege,[4] the *Branzburg* Court noted that

> news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official

---

4. The "sole issue [in that case was the issue of ... whether] reporters [are obligated] to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." The Court stated:

> It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. Under prior cases, otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed.

*Id.* at 682–83, 294 A.2d 149.

harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.

*Id.* at 707–08, 92 S.Ct. 2646 (footnote omitted). In a concurring opinion, Justice Powell stated:

Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 710, 92 S.Ct. 2646.

The *Branzburg* dissent advocated a rule that would require the government to prove three elements before a news reporter could be compelled to testify before a grand jury: (1) "there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law;" (2) "the information sought cannot be obtained by alternative means less destructive of First Amendment rights;" and (3) the government has "a compelling and overriding interest in the information." *Id.* at 743, 92 S.Ct. 2646. In *Tofani v. State*, 297 Md. 165, 465 A.2d 413 (1983), the Court of Appeals made it "clear that *Branzburg* expressly declined to create *any* testimonial privilege, absolute or conditional." *Id.* at 185, 465 A.2d 413. Noting that a number of

jurisdictions have recognized a qualified "newsgatherers' privilege" under the First Amendment,[5] and/or provided some protections to "a non-party journalist . . . called as a witness," the *Tofani* Court concluded that "[a]t most, these [type of] cases establish the principle that when an important interest, such as the First Amendment right to gather news conflicts with other important constitutional interests, courts must carefully consider and balance the competing interests in resolving the controversy." *Tofani*, 297 Md. at 188, 465 A.2d 413.

In *WBAL–TV Div., Hearst Corp. v. State, supra,* the Court of Appeals noted that "[t]here is no specific set of criteria applied uniformly by all courts to determine whether the privilege precludes disclosure in a particular case." 300 Md. at 242–243, 477 A.2d 776. That case involved the issue of whether the circuit court had properly denied a motion to quash a summons requiring a television station to produce "outtakes" of an interview with a criminal defendant that the State wanted to use as evidence at trial. *Id.* at 235, 477 A.2d

---

5. *Id.* at 187, 294 A.2d 149 (citing *In re Petroleum Products Antitrust Litigation,* 680 F.2d 5 (2d Cir.), *cert. denied, Arizona v. McGraw–Hill, Inc.,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981); *Riley v. City of Chester,* 612 F.2d 708 (3d Cir.1979); *Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433 (10th Cir.1977); *United States v. Steelhammer,* 539 F.2d 373 (4th Cir.1976), *rehearing en banc,* 561 F.2d 539 (4th Cir.1977); *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Maughan v. NL Industries,* 524 F.Supp. 93 (D.D.C.1981); *Los Angeles Memorial Coliseum Com'n v. N.F.L.,* 89 F.R.D. 489 (C.D.Cal.1981); *Application of Consumers Union of U.S., Inc.,* 495 F.Supp. 582 (S.D.N.Y.1980); *Matter of Forbes Magazine,* 494 F.Supp. 780 (S.D.N.Y.1980); *Gulliver's Periodicals, Ltd. v. Chas. Levy Cir. Co.,* 455 F.Supp. 1197 (N.D.Ill.1978); *Altemose Const. v. Bldg. & Const. Trades Council,* 443 F.Supp. 489 (E.D.Pa.1977); *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505 (E.D.Va.1976); *Apicella v. McNeil Laboratories,* 66 F.R.D. 78 (E.D.N.Y.1975); *Loadholtz v. Fields,* 389 F.Supp. 1299 (M.D.Fla.1975); *Democratic National Committee v. McCord,* 356 F.Supp. 1394 (D.D.C.1973); *Connecticut State Bd. of Labor Relations v. Fagin,* 33 Conn.Supp. 204, 370 A.2d 1095 (1976); *Winegard v. Oxberger,* 258 N.W.2d 847 (Iowa 1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2234, 56 L.Ed.2d 402 (1978); *Taylor v. Miskovsky,* 640 P.2d 959 (Okla.1981); *Dallas Oil & Gas, Inc. v. Mouer,* 533 S.W.2d 70 (Tex.Civ.App.1976)).

776. WBAL argued that it had a qualified privilege to refuse to release the outtakes,[6] and that the three part test discussed in the *Branzburg* dissent was applicable to the summons. *Id.* at 243–44, 477 A.2d 776.

Without adopting the three part test urged by WBAL, the Court of Appeals concluded that—even if a qualified privilege existed—the State met its burden. *Id.* at 247, 477 A.2d 776. Therefore, the Court affirmed the decision of the trial court to deny WBAL's motion to quash the summons. *Id.* at 247, 477 A.2d 776. The defendant's videotaped statements related to the murders for which he had been charged, and were obviously relevant to the State's case. *Id.* at 244, 477 A.2d 776. The statements were highly relevant as they went to the ultimate question of the defendant's guilt or innocence and were voluntary admissions of the defendant. *Id.* The statements on the outtakes were admissions by a party opponent that could not be duplicated or obtained from any alternative source. WBAL was the sole possessor of the videotaped statements. The three persons who heard or made the statements—the defendant, the reporter, and the cameraman—were not likely to provide a verbatim account of what had been said. It was most unlikely that the defendant would voluntarily incriminate himself. The State had an overriding and compelling interest in the disclosure of the statements, which had such a high "degree of relevance" and "probative value." *Id.* at 244–45, 477 A.2d 776.

In *Delaney v. Superior Court (Kopetman)*, 50 Cal.3d 785, 268 Cal.Rptr.753, 789 P.2d 934 (1990), the Supreme Court of California held that newspersons who observed an arrest were required to testify on the issue of whether the defendant had consented to a search of his jacket, even though the newspersons had not published any accounts of their observations. Although a majority of the court applied a "balancing" test, Justice Mosk explained why the "alternative source" issue is

---

**6.** "Outtakes" are the unbroadcasted parts of a video tape. *Id.* at 236, 477 A.2d 776.

of no consequence when the reporter is an eyewitness to the event at issue:

> I concur, nonetheless, in the court's judgment because I find that the alternative source rule is inapplicable when the information sought is the reporter's own observations as a percipient witness of a transitory event. The alternative source rule arose in cases, such as those cited ante, in which the information in question had been gathered from documents, interviews, public meetings, and the like. In such cases the content of the information existed in some objective and stable form, capable of independent verification—the documents could be independently inspected, the interviewees could be contacted, etc. What the defendants in those cases were primarily interested in was not the reporters' perceptions but the content of these independent information sources.
>
> In the case of eyewitnessed transitory events, however, no such independent, stable information source exists. Equally significant is the well-established fact that there are often major discrepancies between different eyewitness accounts of the same event, owing to distortions and biases in both perception and memory. (See *People v. McDonald* (1984) 37 Cal.3d 351, 363–365 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], and authorities cited; Note, Did Your Eyes Deceive You: Expert Psychological Testimony on the Unreliability of Eyewitness Identification (1977) 29 Stan.L.Rev. 969, 971–989.) Thus, two percipient witnesses of the same event are not in any sense fungible. And unlike the document or the interview, the transitory unrecorded event is not subject to subsequent independent verification.
>
> Accordingly, the reporter as a percipient witness is not an "exception" to the alternative-source rule. Rather, in such situations the rule simply does not apply: in a real sense, two eyewitnesses to the same event are not alternative sources of the same information, but sources of different information.

In the present case, defendant was able to show a reasonable possibility that the information would assist in ascertaining the truth. Because the information he seeks from the reporters is their contemporaneous observations of a transitory event, he has met the second threshold by showing that no real alternative source of the information exists. He is therefore entitled to the reporters' testimony.

*Id.* at 957–58. We agree with that analysis, which comports with the general rule dating to "1742 that 'the public has a right to every man's evidence.'" *Ashford v. State,* 147 Md. App. 1, 61, 807 A.2d 732 (2002) (quoting *Kastigar v. United States,* 406 U.S. 441, 443, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)).

Our conclusion is consistent with the following cases: *State v. Turner,* 550 N.W.2d 622, 628 (Minn.1996) (holding that a news reporter had no privilege to avoid testifying about alleged criminal activity that the reporter personally observed); *State v. Knutson,* 523 N.W.2d 909, 913 (Minn.Ct.App. 1994) (holding that a news reporter does not have a privilege to refuse to testify about an alleged assault that the reporter personally observed); *Dillon v. San Francisco,* 748 F.Supp. 722, 726 (N.D.Cal.1990) (holding that a cameraman cannot refuse to testify about an incident that the cameraman personally observed while filming a different story); *Bartlett v. Superior Court,* 150 Ariz. 178, 722 P.2d 346, 350 (Ct.App.1986) (holding that, because it does not implicate any confidential source or information, a news reporter could not refuse to produce the reporter's videotape of an automobile accident); *Bell v. Des Moines,* 412 N.W.2d 585, 588 (Iowa 1987) (noting that a reporter may not avoid testifying about observations made as an eyewitness); *In re Ziegler,* 550 F.Supp. 530, 532 (W.D.N.Y.1982) (holding that a news reporter cannot avoid testifying about events that the reporter personally observed outside of a courtroom); *Alexander v. Chicago Park District,* 548 F.Supp. 277, 278 (N.D.Ill.1982) (holding that news report-

ers held no privilege to avoid testifying about events that they personally observed during an investigation).

It is beyond dispute that the appellees are eyewitnesses to a relevant event and, despite their contentions to the contrary, Officer Lott's statements are not obtainable from an alternative source. Appellees claim that the newspaper articles themselves, and the affidavit offered by Mr. Hartley,[7] will

---

7. The argument that a reporter's affidavit should be received as an alternative to the reporter's testimony constitutes a waiver of whatever privilege might be applicable. Unlike an offer of compromise excluded under Md. Rule 5–408, when a reporter asks the court to substitute an affidavit for the reporter's testimony, that argument constitutes a waiver. The Unites States District Court for the Middle District of Alabama has ruled that a reporter's qualified privilege under the First Amendment is waived if the reporter gives a litigant an affidavit detailing the substance of the conversation in question. *Pinkard v. Johnson,* 118 F.R.D. 517 (M.D.Ala.1987). In *Pinkard,* the plaintiff and the defendants worked for a racing commission. The plaintiff publicly exposed the policies and procedures of the commission. In his civil suit, the plaintiff alleged that in retaliation for the disclosure, the defendants fabricated charges of sexual harassment against him. While investigating the claim, the plaintiff's attorney took a reporter's voluntary statement relating to a conversation the reporter had with one of the defendants. Subsequently, the reporter gave an affidavit to plaintiff's counsel attesting to his statement. The plaintiff and the defendants sought to depose the reporter. The reporter objected, arguing that he had a qualified privilege under the First Amendment. The federal district court found that the reporter had waived his qualified privilege. It explained:

Both parties are entitled to depose Mr. Chandler [the reporter] concerning the substance of a conversation about which he has already submitted a signed affidavit. On August 11, 1987, Mr. Chandler voluntarily submitted to a taped interview concerning the conversation he had with defendant Johnson [a defendant]. Through this action, the Court finds that Mr. Chandler waived his qualified reporter privilege with regard to this conversation. A reporter is not free to give a sworn statement to a litigant, and later invoke the qualified reporter privilege to keep this information from the Court. However, Mr. Chandler has waived his qualified reporter privilege only as to matters relating to the conversation he had with defendant Johnson a few weeks prior to December 3, 1986.

*Id.* at 523.

Additionally, the *Pinkard* Court stated:

Federal courts have held generally that the qualified privilege does not apply when the reporter is being questioned about an incident to which he or she may be a witness like any other member of the public. *See, e.g., Miller v. Mecklenburg County,* 602 F.Supp. 675

suffice to prove the charges made against Officer Lott. It is obvious that the newspaper articles and the affidavit are hearsay evidence.[8]

> [I]t is well settled that the procedure followed in administrative agencies usually is not as formal and strict as that of the courts. As such, the rules of evidence are generally relaxed in administrative proceedings. Stated differently, that which is inadmissible in a judicial proceeding is not per se inadmissible in an administrative proceeding. It follows, therefore, that hearsay evidence that is inadmissible in a judicial proceeding is not necessarily inadmissible in an administrative proceeding.

*Travers v. Baltimore Police Dep't,* 115 Md.App. 395, 693 A.2d 378 (1997). (citations omitted). It is also well settled that,

> while administrative agencies are not constrained by technical rules of evidence, they must observe basic rules of fairness as to the parties appearing before them so as to comport with the requirements of procedural due process afforded by the Fourteenth Amendment. The Court has remained steadfast in reminding agencies that to be admissible in an adjudicative proceeding, hearsay evidence must demonstrate sufficient reliability and probative value to satisfy the requirements of procedural due process.

---

(W.D.N.C.1985); *Alexander v. Chicago Park Dist.,* 548 F.Supp. 277 (N.D.Ill.1982). In such a case, there is no intrusion into newsgathering or the special functions of the press. *Miller,* 602 F.Supp. at 679. *Id.* at 521.

**8.** Appellee Hartley argues that, under the Administrative Procedure Act ("APA"), Md.Code (1984, 1999 Repl.Vol.) § 10–201–305 of the State Government Article, "[e]vidence may not be excluded solely on the basis that it is hearsay." *Id.* at § 10–213(c). The APA is not applicable to this case. *See Younkers v. Prince George's County,* 333 Md. 14, 17, 633 A.2d 861 (1993) (explaining the APA only applies when a "State police agency is involved"); *Urbana Civic Asso. v. Urbana Mobile Village, Inc.,* 260 Md. 458, 272 A.2d 628 (1971)(county agencies are not included within the provisions of the APA). In *Travers,* the APA was applied because Baltimore City is a State "agency." *Kaufman v. Taxicab Bureau, Baltimore City Police Dep't,* 236 Md. 476, 479–80, 204 A.2d 521, *cert. denied,* 382 U.S. 849, 86 S.Ct. 95, 15 L.Ed.2d 88 (1965).

*Travers,* 115 Md.App. at 411, 693 A.2d 378 (citations omitted). Statements that are (1) sworn under oath, (2) made close in time to the incident, or (3) corroborated are presumed to be more reliable than other statements. *Id.* at 413, 693 A.2d 378. The affidavit offered by Mr. Hartley would be given under penalty of perjury. The newspaper articles corroborate one another. Each article quotes Lott as saying, "I wish I would have been there in '95. I would have shot the bastards, and we wouldn't have all this crap." Each article was published close in time to the incident at issue.[9]

In *Travers,* the person whose allegations served as the basis for the departmental charges against Officer Travers was also the "victim" in the case. *Id.* We concluded that there was some force "behind ... [Travers'] argument that, in a hearing to determine whether he would be permitted to retain his livelihood, due process requires that he be accorded the opportunity to cross-examine a complaining witness." *Id.* Unfortunately for Travers, because he did not exercise his right to subpoena the alleged victim, he waived his right to complain that he would be denied the opportunity to cross-examine her. We also noted that "concerns are less weighty when hearsay statements come into evidence through a disinterested witness because they tend to be more reliable than statements introduced through a witness who has an interest in the subject matter underlying the controversy." *Id.* at 417–18, 693 A.2d 378 (citing *Dembeck v. Bethlehem Shipbuilding Corp.,* 166 Md. 21, 28, 170 A. 158 (1934); *Bethlehem Steel Co. v. Traylor,* 158 Md. 116, 148 A. 246 (1930)).

The Law Enforcement Officers' Bill of Rights ("LEOBR"), Md.Code (1957, 1996 Repl.Vol.), Art. 27, §§ 727–734D is applicable to Officer Lott's administrative hearing. Section 730 of the LEOBR, in pertinent part, states:

---

**9.** Officer Lott purportedly made the statement on August 13, 2001. The next day, August 14, *The Washington Post* and the *Prince George's Journal* published the statement. On August 17, 2001, the *Gazette Newspapers* published its article.

(e) Evidence.—Evidence which possesses probative value commonly accepted by reasonable and prudent men in the conduct of their affairs shall be admissible and shall be given probative effect. The hearing board conducting the hearing shall give effect to the rules of privilege recognized by law, and shall exclude incompetent, irrelevant, immaterial, and unduly repetitious evidence.

Officer Lott has a right to cross-examine witnesses who testify against him. LEOBR at § 730(f); *Travers,* 115 Md. App. at 417, 693 A.2d 378 (citing *American Radio–Telephone Service, Inc. v. Public Service Com.,* 33 Md.App. 423, 434, 365 A.2d 314 (1976) (a "basic tenet of fairness in administrative adjudications is the requirement of an opportunity for reasonable cross-examination")).

If the affidavit or the newspaper articles were admitted into evidence, Lott would be deprived of his fundamental right to cross-examine the appellees. While the appellees' articles constitute the basis for appellant's complaint against Officer Lott, and appellees are not "victims" whose statements might well be unreliable, it cannot be said that the appellees are "disinterested" witnesses. Under these circumstances, due process mandates that Officer Lott be granted the fundamental right to cross-examine the appellees.

At the hearing, appellant's counsel represented to the circuit court that the internal affairs investigator questioned everyone at the courthouse who might have heard the statement. Other than the appellees, only one person acknowledged hearing anything, and this person heard only a portion of Lott's statement. Appellant is not obligated to depose every person present within earshot on the day in question to determine if someone has not been forthcoming. Appellant, therefore, has no other reasonable alternative to putting the appellees on the stand.[10]

---

**10.** There is no merit in appellees' argument that appellant could simply call Lott to the stand and ask him whether he made the statement attributed to him. It is most unlikely that Lott would testify that he made such a statement.

Appellant has a compelling and overriding interest in calling appellees to testify. Adjudicating and disciplining the wrongdoing of errant officers is of utmost importance. If Officer Lott did make the statement, appellant has reason to question whether a sanction should be imposed. Appellant has an interest in maintaining the public's confidence in the police force. The Prince George's County Police Department has been the subject of repeated articles that are critical of its failings and deficiencies.[11] Appellant's ability to adjudicate the

---

11. In the months preceding the date Officer Lott allegedly made his statement, the *Washington Post* alone published numerous articles detailing the Prince George's County Police's failings. *See* April Witt, *Police Bend, Suspend Rules Pr. George's Officers Deny Suspects Lawyers, Observers Say*, Wash. Post, June 5, 2001, at A; April Witt and Ruben Castaneda, *FBI to Probe Pr. George's Interrogations 3 Confessions Raise Civil Rights Questions,* Wash. Post, June 8, 2001, at A1; Jamie Stockwell, *Amnesty International Plans Forums on Police Information Will Be Sent to Justice Dept.,* Wash. Post, June 14, 2001, at T3; Jamie Stockwell, *Alleged Police Abuse Aired in Pr. George's Justice Department Hears Accounts,* Wash. Post, June 27, 2001, at B7; Craig Whitlock and David S. Fallis, *County Officers Kill More Often Than Any in U.S. Officials Ruled Shootings Justified in Every Case—Even of Unarmed Citizens,* Wash. Post, July 1, 2001, at A1; Craig Whitlock and David S. Fallis, *Efforts at Reform Repeatedly Stalled,* Wash. Post, July 1, 2001, at A10; Craig Whitlock and David S. Fallis, *Police Routinely Clear Their Own Prince George's Tolerates Officers Accused of Repeated Abuses,* Wash. Post, July 2, 2001, at A1; *Prince George's Police: Out of Control?,* Wash. Post, July 3, 2001; at A18; Craig Whitlock and David S. Fallis, *Official Secrecy Shrouds Fatal Arrests Prince George's Police Hamper Prosecutors,* Wash. Post, July 4, 2001 at A1; *Brutality in Blue,* Wash. Post, July 4, 2001 at A18; Craig Whitlock and David S. Fallis, *Police Shot Minorities In Greater Numbers Blacks, Latinos Make Up 90% of Cases,* Wash. Post, July 5, 2001 at T3; Jamie Stockwell, *Activists Demand Police Reforms Residents Must Agitate, Pr. George's Leaders Say,* July 5, 2001, at B1; *Excessive Force in Prince George's,* July 5, 2001, at A12; Craig Whitlock and Paul Schwartzman, *Prince George's Police Chief Urged to Step Down,* Wash. Post, July 6, 2001, at B1; Paul Schwartzman, *Stronger Police Panel Sought in Pr. George's,* Wash. Post, July 11, 2001 at B7; Donna Britt, *Feeling the Pain Of Police Shootings,* Wash. Post, July 13, 2001 at B1; Tracey A. Reeves and Hamil R. Harris, *Apathy Toward Abuses Pr. George's Police Has Activists Frustrated Residents Say They Lack Time, Interest, Power,* Wash. Post, July 15, 2001 at C5; Jamie Stockwell, *Residents Urge Action to Stop Police Brutality Forum Participants Suggest Officer Screenings, Reviews,* Wash. Post, July 26, 2001 at T3; Craig Whitlock and Jamie Stockwell, *Pr. George's Reforms Languish Curry, Police Fail to Respond to Task Force's Proposals,* Wash. Post, July 26, 2001 at B7; Craig Whitlock, *FBI to Probe Pr.*

merits of a disciplinary proceeding is essential to the public trust in the system established to deal with police misconduct. Appellees claim that they have several interests of their own that are entitled to protection.[12] None of these interests outweighs appellant's interest in the appellees' testimony.

Appellees are not protecting the confidential source of any information: they are the source. The possibility that individual reporters may be reassigned and other reporters assigned to cover this story is an insignificant intrusion on the press that does not override appellant's compelling interest in the information. Nor are facts present here that the *Branzburg* Court cautioned about. Appellant is not unnecessarily harassing appellees, and is not seeking information remotely or tenuously related to its case. The testimony sought goes to the heart of the matter: whether Officer Lott made the statements in question.[13]

---

*George's Police Cases* Seven *Incidents Include Two Fatal Shootings,* Wash. Post, August 3, 2001 at A1; Craig Whitlock, *Pr. George's Police Face Another FBI Probe Mentally Ill Man Shot After Standoff,* Wash. Post, August 4, 2001, at B5; *The Area's Most Probed Cops,* Wash. Post, August 4, 2001, at A22; Jamie Stockwell, *Crime On Rise In Prince George's Stung by Criticisms, Police Cut Arrests,* August 5, 2001 at A1; *De–Policing Prince George's,* Wash. Post, August 9, 2001 at A18; Jamie Stockwell, *Ward in Pr. George's Has Drop in Arrests Police Diligence Dwindling, Some Say,* Wash. Post, August 10, 2001 at B5; *Policing in Prince George's,* Wash. Post, August 11, 2001 at A20; Hamil R. Harris, *Farrell, Vocal Critic Join Forces Pr. George's Chief Calls on Faith Community to Help Defend Police,* Wash. Post, August 13, 2001 at B1.

12. Appellees' interests are: their interest in non-interference by the judiciary or administrative hearing board; an intrusion may affect their ability to gather and report news to some degree; appellees may appear to be an "investigative arm of the judicial system;" sources may become reluctant to provide information; and the public may be less informed. Appellees also point out that appellee Hartley was reassigned as a result of being subpoenaed.

13. In examining appellees, appellant has proposed that it would be "fact specific as to what the news persons physically heard Officer Lott say on the day in question." Additionally, it suggests limiting the cross-examination of appellees to (1) whether the reporter was present at the time and place when the statement was made; (2) whether the reporter was in physical proximity to hear Lott make the statement; (3) whether the reporters individually heard the statement; and (4) what was their

## II. The Maryland Shield Law

At common law, "no privilege was afforded newsmen ... to conceal from judicial inquiry either the source of their information or the information itself." *Lightman v. State,* 15 Md.App. 713, 717, 294 A.2d 149, *aff'd,* 266 Md. 551, 295 A.2d 470 (1972), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1922, 36 L.Ed.2d 414 (1973) (citations omitted). Maryland's Shield Law, Md.Code (1995 Repl.Vol.) § 9–112 of the Courts and Judicial Proceedings article ("C.J."), ensures that appellees are not a "tool of the judicial system." In 1896, Maryland was the first state to enact a Shield Law protecting the media from revealing the source of its information. *Id.* Maryland's present Shield Law, in pertinent part, provides:

(c) Scope of privilege.—Except as provided in subsection (d) of this section, any judicial, legislative, or administrative body, or any body that has the power to issue subpoenas may not compel any person described in subsection (b) of this section to disclose:

(1) *The source of any news or information* procured by the person while employed by the news media, whether or not the source has been promised confidentiality; or

(2) *Any news or information procured by the person while employed by the news media,* in the course of pursuing professional activities, for communication to the public *but which is not so communicated,* in whole or in part....

C.J. § 9–112(c) (emphasis added).

In *Lightman,* a reporter for the *Baltimore Evening Sun* was summoned to testify before a grand jury concerning illegal drug activities in Ocean City. According to Lightman's news article, he had personally witnessed drug activity in a pipe shop. Claiming that the "source" of his information was the business' shopkeeper, Lightman refused to testify before the grand jury. Both this Court and the Court of Appeals

---

ability to hear and what was said. This questioning would not be unduly burdensome and any interest of appellees that may be implicated does not override appellant's interests.

concluded that Lightman could be required to disclose the location of the pipe shop and the identity of all those that he had observed engaging in illegal activities:

"The general principle of privileged communications is based, in part, on the fundamental condition that the communication originate in confidence that it will not be disclosed without the communicant's consent." See 8 Wigmore (McNaughton Rev.1961) Section 2285.

\* \* \*

"Where a newsman, by dint of his own investigative efforts, personally observes conduct constituting the commission of criminal activities by persons at a particular location, the newsman, and not the persons observed, is the "source" of the news or information in the sense contemplated by the statute. To conclude otherwise in such circumstances would be to insulate the news itself from disclosure and not merely the source, a result plainly at odds with the Maryland law espoused in dictum in *Sheridan*."

\* \* \*

As in *Branzburg*, the situs of the criminal activity, and the persons participating in it, was in this case part of the information obtained by the appellant through his own personal observations and, consequently, neither the identity of the shopkeeper nor the location of the shop constituted the "source" of the news or information published by the appellant. Had the substance of appellant's information been learned, not by personal observation but been supplied to him by an informant, the identity of that informant would clearly be protected.

*Lightman,* 15 Md.App. at 724–25, 294 A.2d 149.

When *Lightman* was decided, the Shield Law did not protect from disclosure the actual news or information procured by the reporter. We expressly acknowledged this in *Lightman* and invited the General Assembly to make any change. *Id.* at 726, 294 A.2d 149. Subsequently, the legislature enact-

ed Chapter 113 of the Acts of 1988, which is, in essence, the present Shield Law. It now protects both the source of any news or information, C.L. § 9–112(c)(1), and the "news or information procured by the person while employed by the news media." C.L. § 9–112(c)(2). The legislature, however, made no change to the principle that a news reporter who personally observes a situation is the "source" of the information.[14] Because none of the appellees is a "source" of information protected by the Shield Law, and because all of the appellees have "communicated" what they claim to have witnessed, neither C.L. § 9–112(c)(1) nor C.L. § 9–112(c)(2) is applicable to the case at bar.

Even if subsections (c)(1) or (c)(2) afforded any protection to the appellees, they were not entitled to the relief that they received in the circuit court. C.L. § 9–112(d)(1) provides:

> (d) *Court may compel disclosure.*—(1) A court may compel disclosure of news or information, if the court finds that the party seeking news or information protected under subsection (c)(2) of this section has established by clear and convincing evidence that:
>
> (i) The news or information is relevant to a significant legal issue before any judicial, legislative, or administrative body, or any body that has the power to issue subpoenas;
>
> (ii) The news or information could not, with due diligence, be obtained by any alternate means; and

---

**14.** In *Bilney v. Evening Star Newspaper Co.,* 43 Md.App. 560, 406 A.2d 652 (1979), we concluded, in part, that the Shield Law protected two persons from divulging their confidential source of information. Burke and Kram had obtained from a confidential source information about University of Maryland basketball players' academic performances. They asserted that the information was voluntarily and gratuitously given to them. The two passed on the information to the *Star,* which ran an article in the *Diamondback* detailing the players' academic failings. The basketball players sued claiming invasion of privacy and intentional infliction of mental distress. The appellants in *Bilney* argued that Burke and Kram had waived their right not to reveal the source of their information because they characterized the information as having been "voluntarily and gratuitously" given. We declined to endorse this argument, and concluded that Burke and Kram had not waived their right to reveal the source of their information.

(iii) There is an overriding public interest in disclosure.

For the reasons set forth above, we are persuaded that appellant satisfied its burden of persuasion under this provision, which is essentially a codification of the factors discussed in the *Branzburg* dissent. We therefore hold that the circuit court erred in quashing the summonses requiring appellees to appear and testify at Officer Lott's administrative hearing.

## Proceedings on Remand

Our conclusion that appellees are compellable witnesses does not mean that the Shield Law will be inapplicable to every question that they might be asked at the administrative hearing. Officer Lott's right to meaningful cross-examination is not a license to acquire information protected by C.L. § 9–112(c)(2), which protects appellees from disclosing, *inter alia*, (1) news or information not communicated to the public, or (2) appellees' notes, sound tapes or any "other data ... not itself disseminated in any manner to the public." It is well settled that a witness' direct examination does not, of itself, constitute a waiver of any applicable privilege. *See, e.g., Avery v. State,* 15 Md.App. 520, 536, 292 A.2d 728 (1972); *Oliver v. State,* 53 Md.App. 490, 499, 454 A.2d 856 (1983); *Clark v. State,* 364 Md. 611, 662, 774 A.2d 1136 (2001). The holdings in these cases are applicable to C.L. § 9–112(c)(2).

During the administrative hearing, each appellee will be entitled to a determination of whether he may refuse to answer a particular question on the ground that the answer would result in the disclosure of privileged information. In the first instance, this determination must be made by the hearing board.[15] We are confident that the hearing board will

---

15. The member of the hearing board assigned to rule on objections to questions has the duty to sustain an objection to an improper question. Lawyers who participate in the hearing will be doing so in their roles as officers of the court, and must "not confuse the absolute right to cross-examine with the less-than-absolute right to ask a specific question." *Elmer v. State,* 119 Md.App. 205, 217, 704 A.2d 511 (1998) *rev. on different grounds,* 353 Md. 1, 724 A.2d 625 (1999). In a trial, the appropriate remedy for incomplete cross-examination is left to the

protect appellees' rights under the Shield Law as well as Officer Lott's right to meaningful cross-examination.

**ORDER OF THE CIRCUIT COURT QUASHING APPELLEES' SUBPOENAS REVERSED; CASE REMANDED FOR ENTRY OF ORDER DENYING APPELLEES' MOTIONS TO QUASH SUBPOENAS; COSTS TO BE PAID BY APPELLEES.**

sound discretion of the trial court, whose remedy of choice will be affirmed on appeal unless the reviewing court is persuaded that the trial court abused its discretion. See, e.g., *Meley v. De Coursey*, 204 Md. 648 at 655, 106 A.2d 65 (1954), and John W. Strong, *McCormick on Evidence* § 19 (4th ed.1992). During the administrative hearing, if the hearing board concludes that a witness does have a privilege to refuse to answer a particular question, it will be for the hearing board to determine whether all or part (or none) of that witness' testimony should be stricken. Such a determination involves the exercise of sound discretion.